Arthur Earl **MARSHALL**, Appellant,

v.

**UNITED STATES of America,**
Appellee.

No. 26037.

United States Court of Appeals,
Fifth Circuit.

Jan. 22, 1970.

---

Robert Watson, Houston, Tex. (Court-appointed), for appellant.

Morton L. Susman, U. S. Atty., Donald L. Stone, James R. Gough, Asst. U. S. Attys., Houston, Tex., for appellee.

Before COLEMAN and GOLDBERG, Circuit Judges, and SKELTON, Judge of the Court of Claims*.

GOLDBERG, Circuit Judge:

Appellant Arthur Earl Marshall posits two fallibilities in his conviction for possession of an illegally made firearm.[1] First, he asserts error in the evidentiary use of the fruit of a search he deems illegal. Secondly, he claims that his conviction violated Fifth Amendment rights vouchsafed to him through *Marchetti*,[2] *Grosso*,[3] and *Haynes*.[4]

---

\* Sitting by designation as a member of this panel.

1. Marshall was convicted of violating 26 U.S.C.A. § 5851 by having in his possession a firearm which had been made in violation of 26 U.S.C.A. § 5821.

2. Marchetti v. United States, 1968, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889.

3. Grosso v. United States, 1968, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906.

4. Haynes v. United States, 1968, 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923.

The facts can be briefly summarized. On September 9, 1967, Roland A. Kinsey, Jr., a deputy sheriff in Harris County, Texas, was on his regular tour of duty as an accident investigator. At about 1:15 a. m. on that date he stopped to get a cup of coffee at a drive-in restaurant. While at the drive-in, he approached a car parked in the parking lot. Looking into the automobile, he observed appellant Marshall reclining in the driver's seat, a hat pulled down over his eyes, apparently asleep. Shining his flashlight into the car, Officer Kinsey noticed a sawed-off shotgun resting on the floorboard between Marshall's feet. He then opened the car door, awakened Marshall, and placed him under arrest.

On March 11, 1968, Marshall was tried in the United States District Court for the Southern District of Texas for possession of an illegally made firearm. On that date he was found guilty by the jury, and on March 28, 1968, he was sentenced by the court to a term of five years in prison. He now appeals his conviction to this court.

## I.

■ At trial Marshall objected to the introduction of evidence concerning the shotgun on the ground that it had been obtained as the result of an illegal search. He contended that evidence regarding anything which Officer Kinsey observed by directing the beam of his flashlight into the car should be ruled inadmissible.

The trial judge heard evidence outside the presence of the jury to determine the merits of this claim. Officer Kinsey was questioned about the events preceding the arrest. According to his testimony, when he arrived at the drive-in his wife told him that the car had been parked in the parking lot for about an hour with its lights on and the driver lying back in the seat. During that time no one had emerged from the car to order food. Officer Kinsey said he regarded this as a highly unusual circumstance. His purpose in going over to the car, he explained, was to see whether anything was wrong. Officer Kinsey's testimony concerning his motivation for investigating the car was not contradicted.

After hearing this testimony, the trial judge overruled Marshall's objection to the admission of the evidence. He stated that, in his opinion,

> "[t]his was not a search of the car in the normal sense of the word. * * [Officer Kinsey's] purpose was not to search it and not to arrest, but to see if anything was wrong, sick or needed help, and I see nothing wrong in an officer doing what he did. No more than looking inside the car to see if the occupants are ill or injured or need help or anything like that."

In his post-trial memorandum opinion the trial judge reaffirmed his ruling in these words:

> "I incline to the view that there was no search of the automobile; but if there was, it was not illegal. The weapon fell within the plain view of the officer at a time when he was lawfully in a position to have that view. * * * The gun was therefore subject to seizure and admissible in evidence." [Case citations omitted].

Marshall now urges this court to declare the evidence inadmissible as the result of an illegal search. At first blush it would appear that his contention raises two questions: (1) whether there was a search, and (2) if there was a search, whether it was illegal. The second question, however, is not disputed on appeal. The government now concedes that if Officer Kinsey was conducting a *search* by shining the beam of his flashlight into the interior of the car, the search was illegal.[5] Consequently, the only question to be decided here is whether a Fourth Amendment search did in fact take place.

---

5. The government's brief includes the following statement: "The appellant contends, and it is not contested, that officer Kinsey did not have probable cause to search the vehicle."

Our starting point in analyzing this question must be the doctrine known as the "plain view" rule. Under this rule "[i]t has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." Harris v. United States, 1968, 390 U.S. 234, 236, 88 S.Ct. 992, 19 L.Ed.2d 1067, 1069. Evidence concerning "[t]hat which is in plain view *is not the product of a search.*" United States v. Barone, 2 Cir. 1964, 330 F.2d 543, 544, cert. denied, 377 U.S. 1004, 84 S.Ct. 1940, 12 L.Ed.2d 1053 (emphasis added); accord, Ker v. California, 1963, 374 U.S. 23, 43, 83 S.Ct. 1623, 10 L.Ed.2d 726, 744; Agius v. United States, 5 Cir. 1969, 413 F.2d 915, 919; Creighton v. United States, 1968, 132 U.S.App.D.C. 115, 406 F.2d 651, 652; Shorey v. Warden, Maryland State Penitentiary, 4 Cir. 1968, 401 F.2d 474, 478, cert. denied, 393 U.S. 915, 89 S.Ct. 241, 21 L.Ed.2d 201.

Under the circumstances of the case before us, if Officer Kinsey had observed Marshall's shotgun on the floorboard of the car in broad daylight by the use of the naked eye, the evidence thereby obtained would clearly come within the scope of the plain view rule. Even Marshall concedes this.[6] However, Marshall contends that the use of the flashlight as a means to detect the contents of the car transformed Officer Kinsey's activities into a search within the meaning of the Fourth Amendment.[7] We cannot agree.

The view that the use of a visual aid such as a flashlight changes the character of a visual encounter by a police officer has been repeatedly rejected by the courts. Dorsey v. United States, 1967, 125 U.S.App.D.C. 355, 372 F.2d 928, 931 ("Both appellants conceded before us that this could properly have been done in the daytime. We do not think the need to employ a visual aid at night in the form of a flashlight converts this from lawful into unlawful conduct."); Petteway v. United States, 4 Cir. 1958, 261 F.2d 53, 54 ("It is well established that it is not a search to observe what is open and patent either in daylight or in artificial light."); United States v. Callahan, D.Minn.1964, 256 F.Supp. 739, 745 ("It does not constitute a search to observe that which occurs openly in a public place and which is exposed to visual observation, and this rule includes observations whether made in daylight or in artificial light."); see Safarik v. United States, 8 Cir. 1933, 62 F.2d 892, 895; *cf.* Haerr v. United States, 5 Cir. 1957, 240 F.2d 533.

Notwithstanding the abundant authority contrary to his position, Marshall contends that the use of a flashlight in the present case converted Officer Kinsey's visual scanning of the car into a search. He cites as his only authority a state court case, Pruitt v. State, Tex.Crim. App.1965, 389 S.W.2d 475. *Pruitt* involved a conviction for unlawful transportation of wine in a dry area. The Texas Highway Patrolman who arrested Pruitt testified that he stopped Pruitt's car, late at night on a deserted country road, to check Pruitt's driver's license. After Pruitt showed him his license, the patrolman directed the beam of his flashlight into the car and discovered the prohibited wine in the back seat of the car. The Texas Court of Criminal Appeals reversed Pruitt's conviction, holding that the evidence concerning the wine was the product of an illegal search.

6. Appellant's brief includes the following passage:

"Of course, if the shotgun at issue in this appeal had been visible to the naked eye of Officer Kinsey, there would not have been a search, since presumably the mere existence of the shotgun in the floorboard of the automobile would have been an offense committed in the view of Officer Kinsey. It seems to be inescapable that, considering the fact that it was dark and the officer had no other means of detecting the exact contents of the automobile in question, the use by Officer Kinsey of the flashlight to inspect the automobile was definitely a search."

7. See footnote 6, *supra.*

There is language in the *Pruitt* opinion which implies that the use of a flashlight converts what would otherwise be a non-accusatory visual encounter into a Fourth Amendment search. 389 S.W. 2d at 476–477. This language is, in our view, both unpersuasive and contrary to the great weight of authority.[8] However, the basis of the holding in *Pruitt* appears to be the Texas court's view of the police officer's intent. The court concluded from the evidence in the record that the officer's real purpose in stopping Pruitt's car was to investigate for evidence of some law violation other than non-possession of a valid driver's license. 389 S.W.2d at 476. The Texas court's conclusion that the arresting officer had the intent to search for evidence of the commission of a crime makes the holding in *Pruitt* inapposite to the present case.

In the case before us there was no intent to conduct a Fourth Amendment search.

"A search implies an examination of one's premises or person with a view to the discovery of contraband or evidence of guilt to be used in prosecution of a criminal action. The term implies exploratory investigation or quest." Haerr v. United States, 5 Cir. 1957, 240 F.2d 533, 535.

Here there was no probing, exploratory investigation for evidence of crime. According to Officer Kinsey's uncontradicted testimony, he was not motivated by an intention to search for evidence of a law violation. He was not even called to the scene as a law officer. He came merely as a husband to drink coffee at the restaurant where his wife was employed. She asked him to look at a car whose lights had been burning for an hour and whose occupants had not ordered anything from the restaurant. When he complied with her request, his investigation of the car was motivated by a desire

to render assistance rather than an intent to uncover any contraband or other evidence of crime. Surely this samaritan investigation cannot give rise to a genuine Fourth Amendment complaint on the part of Marshall. Humanitarian scanning is not Fourth Amendment searching, even when it occurs after dark with the aid of a flashlight.

■■■ We do not hold, of course, that *every* use of a flashlight is not a search. A probing, exploratory quest for evidence of crime is a search governed by Fourth Amendment standards whether a flashlight is used or not. The mere use of a flashlight, however, does not magically transmute a non-accusatory visual encounter into a Fourth Amendment search. When the circumstances of a particular case are such that the police officer's observation would not have constituted a search had it occurred in daylight, then the fact that the officer used a flashlight to pierce the nighttime darkness does not transform his observation into a search. Regardless of the time of day or night, the plain view rule must be upheld where the viewer is rightfully positioned, seeing through eyes that are neither accusatory nor criminally investigatory. The plain view rule does not go into hibernation at sunset.

No one disputes the fact that Officer Kinsey had a right to be where he was when he first saw the shotgun, and we do not believe that his use of a visual aid converted his non-accusatory observation into a Fourth Amendment search. Convinced as we are that Officer Kinsey did not engage in a search within the meaning of the Fourth Amendment, we conclude that the government's evidence concerning the sawed-off shotgun was properly admitted by the court below.

## II.

Marshall's second contention is that his conviction for possession of an il-

---

8. Despite the language to which we make reference, 389 S.W.2d at 476–477, we could not reasonably conclude that the Texas court consciously rejected the voluminous authority contrary to its point of view. The opinion in *Pruitt* indicates that the Texas court did not consider any of the cases cited in the present opinion which contradict the Texas court's language.

legally made firearm violated his Fifth Amendment rights. Having made a timely assertion of his privilege against self-incrimination in the court below, he now renews his contention that he cannot be subjected to criminal punishment under the statute here involved without a violation of that privilege. An assessment of Marshall's claim entails a consideration of the statutory scheme under which he was convicted, and to that we now turn.

Marshall was convicted of violating 26 U.S.C.A. § 5851, which forms part of the National Firearms Act.[9] Section 5851 makes criminal three separate offenses.[10] First, it is "unlawful for any person to receive or possess any firearm which has at any time been transferred in violation of" any of certain specified sections of the Act. Second, it is "unlawful for any person to receive or possess any firearm * * * which has at any time been made in violation of section 5821." Third, it is "unlawful for any person * * * to possess any firearm which has not been registered as required by section 5841." Section 5851 also contains a presumption based on possession:

> "Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of such firearm, such possession shall be deemed sufficient evidence to authorize conviction, unless the defendant explains such possession to the satisfaction of the jury."

Marshall was convicted of violating the second provision of § 5851 by having in his possession a firearm (the sawed-off shotgun) which had been made in violation of § 5821.[11]

Section 5821 provides for a tax on the "making" of "firearms."[12] The

---

9. For a general discussion of the National Firearms Act see Haynes v. United States, 1968, 390 U.S. 85, 87–89, 88 S.Ct. 722, 19 L.Ed.2d 923, 926–928.

10. 26 U.S.C.A. § 5851 provides:
It shall be unlawful for any person to receive or possess any firearm which has at any time been transferred in violation of section 5811, 5812(b), 5813, 5814, 5844, or 5846, or which has at any time been made in violation of section 5821, or to possess any firearm which has not been registered as required by section 5841. Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of such firearm, such possession shall be deemed sufficient evidence to authorize conviction, unless the defendant explains such possession to the satisfaction of the jury.

11. The indictment returned against Marshall was in two counts. The first count charged him with violating the second provision of § 5851 by possessing a firearm which had been made in violation of § 5821. The second count charged him with violating the third provision of § 5851 by possessing a firearm which had not been registered as required by § 5841. The second count, however, was dismissed on motion of the government, and Marshall was tried and convicted on only the first count.

12. 26 U.S.C.A. § 5821 provides:
(a) Rate.—There shall be levied, collected, and paid upon the making in the United States of any firearm (whether by manufacture, putting together, alteration, any combination thereof, or otherwise) a tax at the rate of $200 for each firearm so made.
(b) Exceptions.—The tax imposed by subsection (a) shall not apply to the making of a firearm—
(1) by any person who is engaged within the United States in the business of manufacturing firearms;
(2) from another firearm with respect to which a tax has been paid, prior to such making, under subsection (a) of this section; or
(3) for the use of—
(A) the United States Government, any State, Territory, or possession of the United States, any political subdivision thereof, or the District of Columbia, or
(B) any peace officer or any Federal officer designated by regulations of the Secretary or his delegate.
Any person who makes a firearm in respect of which the tax imposed by subsection (a) does not apply by reason of the preceding sentence shall make such report in respect thereof as the Secretary or his delegate may by regulations prescribe.
(c) By whom paid; when paid.—The tax imposed by subsection (a) shall be

term "making" is defined broadly to include any construction of a firearm "whether by manufacture, putting together, alteration, any combination thereof, or otherwise." 26 U.S.C.A. § 5821(a). Thus the statutory definition of "making" clearly includes the alteration of a shotgun by sawing off the barrel. Moreover, it is undisputed that appellant Marshall's shotgun, after the barrel had been sawed off, constituted a "firearm" as that term is defined in the Act.[13] It is also undisputed, however, that the tax on the making of this firearm was never paid as required by the provisions of § 5821.

With certain exceptions not here relevant,[14] § 5821 imposes a tax in the

paid by the person making the firearm. Such tax shall be paid in advance of the making of the firearm.

(d) *How paid.*—Payment of the tax imposed by subsection (a) shall be represented by appropriate stamps to be provided by the Secretary or his delegate.

(e) *Declaration.*—It shall be unlawful for any person subject to the tax imposed by subsection (a) to make a firearm unless, prior to such making, he has declared in writing his intention to make a firearm, has affixed the stamp described in subsection (d) to the original of such declaration, and has filed such original and a copy thereof. The declaration required by the preceding sentence shall be filed at such place, and shall be in such form and contain such information, as the Secretary or his delegate may by regulations prescribe. The original of the declaration, with the stamp affixed, shall be returned to the person making the declaration. If the person making the declaration is an individual, there shall be included as part of the declaration the fingerprints and a photograph of such individual.

13. According to the evidence in the record, Marshall's sawed-off shotgun had a barrel length of only 12¼ inches and an overall length of only 19½ inches. Thus his shotgun after alteration clearly came within the statutory definition of a "firearm." The statutory definition is found in 26 U.S.C.A. § 5848, which provides in pertinent part:

For purposes of this chapter—

(1) *Firearm.*—The term "firearm" means a shotgun having a barrel or barrels of less than 18 inches in length, or a rifle having a barrel or barrels of less than 16 inches in length, or any weapon made from a rifle or shotgun (whether by alteration, modification, or otherwise) if such weapon as modified has an overall length of less than 26 inches, or any other weapon, except a pistol or revolver, from which a shot is discharged by an explosive if such weapon is capable of being concealed on the person, or

a machine gun, and includes a muffler or silencer for any firearm whether or not such firearm is included within the foregoing definition.

\* \* \* \* \*

(4) *Shotgun.*—The term "shotgun" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger.

\* \* \* \* \*

14. The statutory exceptions are found in 26 U.S.C.A. § 5821(b), which is set out in full in footnote 12, *supra.* The provisions of 26 C.F.R. §§ 179.82, 179.83, and 179.84 also deal with exceptions to the making tax.

26 C.F.R. § 179.82 provides:

A manufacturer qualified under this part to engage in such business may make the type of firearm which he is qualified to manufacture without payment of the making tax. However, such manufacturer shall report and register each firearm made in the manner prescribed by this part.

26 C.F.R. § 179.83 provides:

A firearm may be made by, or on behalf of, the United States or any department, independent establishment, or agency thereof without payment of the making tax. However, if a firearm is to be made on behalf of the United States, the maker must file an application, in duplicate, on Form 1A (Firearms) and obtain the approval of the Director in the manner prescribed in § 179.77.

26 C.F.R. § 179.84 provides:

A firearm may be made without payment of the making tax by, or on behalf of, any State, or possession of the United States, any political subdivision thereof, or any official police organization of such a government entity engaged in criminal investigations. Any person making a firearm under this section shall

amount of $200.00 upon every making of a firearm in the United States. 26 U.S.C.A. § 5821(a); 26 C.F.R. § 179.75. The tax must be paid by the person making the firearm prior to the making of the firearm. 26 U.S.C.A. § 5821(c); 26 C.F.R. §§ 179.75, 179.77, 179.79. Payment of the tax is evidenced by a National Firearms Act tax stamp issued by the Internal Revenue Service. 26 U.S.C.A. § 5821(d); 26 C.F.R. § 179.75.

The statute sets out in general terms the procedures to be used in the payment and collection of the tax. 26 U.S.C.A. § 5821(e). Under the terms of the statute, anyone who intends to make a firearm must file a declaration of his intention prior to the making of the firearm. A tax stamp must be affixed to the declaration to show that the tax has been paid. If the declaration is filed by an individual, it must include the fingerprints and a photograph of the individual. In addition, the statute provides that the declaration "shall be in such form and contain such information as the Secretary [of the Treasury] or his delegate may by regulations prescribe."

Pursuant to this statutory mandate, the Secretary's delegate—the Director of the Alcohol and Tobacco Tax Division of the Internal Revenue Service—has promulgated regulations setting out more detailed requirements. Under these regulations,[15] the declaration constitutes an

---

first file an application, in duplicate, on Form 1A (Firearms) and obtain the approval of the Director as prescribed in § 179.77.

15. Relevant provisions of the regulations are found in 26 C.F.R. §§ 179.75, 179.77, 179.78, 179.79, 179.79a, and 179.81.
26 C.F.R. § 179.75 provides:
Except as provided in this subpart, there shall be levied, collected, and paid upon the making of a firearm a tax at the rate of $200 for each firearm made. This tax shall be paid by the person making the firearm. Payment of the tax on the making of a firearm shall be represented by a $200 adhesive stamp bearing the words "National Firearms Act."
26 C.F.R. § 179.77 provides:
No person shall make a firearm unless he has filed with the Director a written application, in duplicate, on Form 1A (Firearms) to make and register the firearm and has received the approval of the Director to make the firearm, which approval shall effectuate registration of the weapon to the applicant. The application shall identify the firearm to be made by serial number, model, length of barrel, and such other additional information as may be required on the Form 1A (Firearms). The applicant must identify himself on the Form 1A (Firearms) by name and address and, if other than a natural person, the name and address of the principal officer or authorized representative and, if an individual, the identification must include the information prescribed in § 179.78. A National Firearms Act stamp (see § 179.75) must be affixed to the original

application in the space provided therefor and properly canceled (see § 179.81) if the making is taxable. If the making of the firearm is tax exempt under this part, an explanation of the basis of the exemption shall be attached to the Form 1A (Firearms). Form 1A (Firearms) and appropriate tax stamp may be obtained from any District Director of Internal Revenue.
26 C.F.R. § 179.78 provides:
If the declarant is an individual, he shall attach to each copy of the declaration an individual photograph of himself, taken within one year prior to the date of such declaration, and shall affix his fingerprints to such declaration. The fingerprints must be clear for accurate classification and should be taken by someone properly equipped to take them. The declaration must be supported by a certificate of the local chief of police, sheriff of the county, United States attorney, United States marshal, or such other person whose certificate may in a particular case be acceptable to the Director, Alcohol and Tobacco Tax Division, certifying that he is satisfied that the fingerprints and photograph appearing on the declaration are those of the declarant and that the firearm is intended by such person for lawful purposes.
26 C.F.R. § 179.79 provides:
The declaration of intent, to make a firearm, Form 1A (Firearms), must be forwarded directly, in duplicate, by the maker of the firearm to the Director, Alcohol and Tobacco Tax Division, Internal Revenue Service, Washington 25, D. C. The Director, Alcohol and Tobacco Tax Division, will consider the application for approval or disapproval. If

application to the Director for authorization to make the firearm. See 26 C.F.R. §§ 179.77, 179.79. The application must be made on a prescribed form known as "Form 1A (Firearms)." 26 C.F.R. § 179.77. The application must identify the firearm by providing certain required information and must include a properly cancelled National Firearms Act tax stamp. *Id.* If filed by an individual, the application also must identify the applicant by name and address and must include a recent photograph of the applicant and his fingerprints. *Id.*; 26 C.F.R. § 179.78. In addition, an application filed by an individual "must be supported by a certificate of the local chief of police, sheriff of the county, United States attorney, United States marshal, or such other person whose certificate may in a particular case be acceptable to the Director." 26 C.F.R. § 179.78. The law enforcement official who signs the certificate must certify (1) that he is satisfied "that the fingerprints and photograph appearing on the declaration are those of the declarant" and (2) that he is satisfied "that the firearm is intended by such person for lawful purposes." *Id.*

When completed, the application must be forwarded in duplicate to the office of the Director in Washington for his approval or disapproval. If the application is approved, the Director returns the original to the applicant and retains the duplicate. The regulations make it clear that the firearm cannot legally be made until *after* the application has been approved and returned to the applicant; 26 C.F.R. § 179.79 provides in pertinent part:

"Upon receipt of the approved declaration, the maker is authorized to make the firearm described therein. The maker of the firearm shall not, under any circumstances, make the firearm until the declaration, satisfactorily executed, with the 'National Firearms Act' stamp attached, has been forwarded to the Director, Alcohol and Tobacco Tax Division, and has been approved and returned by him."

If the application is not approved, the Director retains the duplicate and returns the original to the applicant along with a statement of the reasons for disapproval. 26 C.F.R. § 179.79. When an application is not approved, the firearm cannot be made in compliance with the law.

■ With the statutory framework in mind, we turn to appellant Marshall's Fifth Amendment claim. Marshall contends that his conviction under the second provision of § 5851 violated his privilege against self-incrimination. In advancing this argument Marshall attempts to bring himself within the scope of the rationale underlying the decisions of the Supreme Court in the *Marchetti-Grosso-Haynes* trilogy and the subsequent *Leary* and *Covington* cases. Marchetti

---

the application is approved, the Director, Alcohol and Tobacco Tax Division, will return the original thereof to the maker of the firearm and retain the duplicate. Upon receipt of the approved declaration, the maker is authorized to make the firearm described therein. The maker of the firearm shall not, under any circumstances, make the firearm until the declaration, satisfactorily executed, with the "National Firearms Act" stamp attached, has been forwarded to the Director, Alcohol and Tobacco Tax Division, and has been approved and returned by him. If the application is disapproved, the original Form 1A (Firearms) with the "National Firearms Act" stamp attached thereto will be returned to the maker with the reasons for disapproval stated on the form.

26 C.F.R. § 179.79a provides:

An application to make a firearm shall not be approved by the Director if the making or possession of the firearm would place the person making the firearm in violation of the law.

26 C.F.R. § 179.81 provides:

The person affixing to a Form 1A (Firearms) a "National Firearms Act" stamp shall cancel it by writing or stamping thereon, in ink, his initials, and the day, month and year, in such manner as to render it unfit for reuse. The cancellation shall not so deface the stamp as to prevent its denomination and genuineness from being readily determined.

v. United States, 1968, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889; Grosso v. United States, 1968, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed.2d 906; Haynes v. United States, 1968, 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923; Leary v. United States, 1969, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed. 2d 57; United States v. Covington, 1969, 395 U.S. 57, 89 S.Ct. 1559, 23 L.Ed.2d 94. These cases stand for the proposition that where compliance with a criminal statute would have subjected the defendant to "real and appreciable" hazards of incrimination under other criminal legislation, his assertion of his privilege against self-incrimination precludes his conviction for non-compliance with the statute.

*Marchetti* and *Grosso* involved federal statutes requiring gamblers to register and pay certain taxes. The Court concluded that compliance with these registration and tax statutes would significantly enhance the likelihood of criminal prosecution under federal and state laws. Consequently, the Court held that a defendant who raises a proper Fifth Amendment defense cannot be criminally punished for non-compliance with the registration and tax statutes. *Leary* and *Covington* involved transfer tax provisions of the Marijuana Tax Act. The Court, concluding that these provisions would force those who comply with them to incriminate themselves under state laws, held that non-compliance cannot be criminally punished in the face of a proper Fifth Amendment objection.

*Haynes*, the case upon which appellant chiefly relies, involved registration provisions of the National Firearms Act. Haynes was convicted of violating the third provision of 26 U.S.C.A. § 5851 by possessing a firearm which had not been registered as required by § 5841. Section 5841 provides that any person who possesses a firearm must register it unless he made or acquired the firearm in compliance with the provisions of the Act.[16] In other words, any person who possesses a firearm which he made or acquired in violation of the Act is required by § 5841 to register. It is obvious that this registration requirement places the possessor of a firearm acquired in violation of any of the Act's provisions in an impossible dilemma. If he fails to register, he is subject to punishment under both § 5841 (for failure to register) and § 5851 (for possession of an unregistered firearm). On the other hand, if he chooses to comply with the registration requirement, he thereby informs law enforcement officials that he acquired or made the firearm illegally. Because of this self-incrimination problem, the Court in *Haynes* held that a proper assertion of the Fifth Amendment privilege provides a full defense to any prosecution under § 5841 for failure to register a firearm. Moreover, on the basis of its conclusion that the offenses punishable under §§ 5841 and 5851 are not meaningfully distinguishable,[17] the Court held that a proper assertion of the Fifth Amendment privilege provides a full defense to any prosecution under § 5851 for possession of an unregistered firearm.

The Court did not consider in *Haynes*, nor has it considered subsequently, the applicability of the *Marchetti-Grosso-Haynes* rationale to prosecutions under the second provision of § 5851 for re-

16. 26 U.S.C.A. § 5841 provides:
    Every person possessing a firearm shall register, with the Secretary or his delegate, the number or other mark identifying such firearm, together with his name, address, place where such firearm is usually kept, and place of business or employment, and, if such person is other than a natural person, the name and home address of an executive officer thereof. No person shall be required to register under this section with re-

spect to a firearm which such person acquired by transfer or importation or which such person made, if provisions of this chapter applied to such transfer, importation, or making, as the case may be, and if the provisions which applied thereto were complied with.

17. See Haynes v. United States, 1968, 390 U.S. 85, 90–95, 88 S.Ct. 722, 19 L.Ed.2d 923, 928–931.

ceiving or possessing a firearm "which has at any time been made in violation of section 5821." Lower courts, however, including this court, have considered this question. See Burton v. United States, 5 Cir. 1969, 414 F.2d 261; Lewis v. United States, 10 Cir. 1969, 408 F.2d 1310; Reed v. United States, 8 Cir. 1968, 401 F.2d 756, 761–763, cert. denied, 394 U.S. 1021, 89 S.Ct. 1637, 23 L.Ed.2d 48; De-Pugh v. United States, 8 Cir. 1968, 401 F.2d 346, 351–352; United States v. Thompson, D.Del.1968, 292 F.Supp. 757, 762–765; United States v. Benner, D. Or.1968, 289 F.Supp. 860; United States v. Casson, D.Del.1968, 288 F.Supp. 86; United States v. Taylor, E.D.Wis. 1968, 286 F.Supp. 683; United States v. Stevens, D.Minn.1968, 286 F.Supp. 532; see also Moodyes v. United States, 8 Cir. 1968, 400 F.2d 360, 361 n. 2; United States v. Harvey, 7 Cir. 1968, 397 F.2d 526, 527 n. 2.[18] The courts have generally held that the second provision of § 5851 does not present a Fifth Amendment problem insofar as the *possessor* of the firearm is concerned.[19] Although the *maker* of the firearm is required by § 5821 to provide information about the firearm prior to its making, the *possessor* of the firearm after its making is not required to come forward and give information of any kind to anyone. Neither § 5851 nor § 5821 compels a *possessor* to incriminate himself in any manner.[20] At least one court, however, has perceived a self-incrimination problem when the same person is both possessor and maker. United States v. Thompson, *supra*. Self-incrimination in such a case does not occur because of federal law: if the maker of the firearm complies with § 5821 in making it, his continued possession thereafter is completely legal under the National Firearms Act and apparently violates no other federal statute.[21] However, one who completely complies with § 5821 in the making of a firearm may, in the course of his compliance, incriminate himself under state or local law.[22] For example, in a jurisdiction which flatly prohibits the making and possession of sawed-off shotguns, a person who makes a sawed-off shotgun in compliance with § 5821 will incriminate himself under local law by giving the information required on his application to make the firearm. Where circumstances of this nature exist, *Thompson* held, the privilege against self-incrimination can be asserted by one who is both maker and possessor as a defense to a prosecution under the second provision of § 5851.

18. For pre-*Haynes* decisions see Sipes v. United States, 8 Cir. 1963, 321 F.2d 174, cert. denied, 375 U.S. 913, 84 S.Ct. 208, 11 L.Ed.2d 150; Mares v. United States, 10 Cir. 1963, 319 F.2d 71.

19. *See* Burton v. United States, 5 Cir. 1969, 414 F.2d 261; Lewis v. United States, 10 Cir. 1969, 408 F.2d 1310; Reed v. United States, 8 Cir. 1968, 401 F.2d 756, 761–763, cert. denied, 394 U.S. 1021, 89 S.Ct. 1637, 23 L.Ed.2d 48; De-Pugh v. United States, 8 Cir. 1968, 401 F.2d 346, 351–352; United States v. Thompson, D.Del.1968, 292 F.Supp. 757, 762–765; United States v. Benner, D. Or.1968, 289 F.Supp. 860; United States v. Casson, D.Del.1968, 288 F. Supp. 86; United States v. Taylor, E.D. Wis.1968, 286 F.Supp. 683. *But see* United States v. Stevens, D.Minn.1968, 286 F.Supp. 532.

20. Burton v. United States, 5 Cir. 1969, 414 F.2d 261, 262–263; United States

v. Benner, D.Or.1968, 289 F.Supp. 860, 861; United States v. Taylor, E.D.Wis. 1968, 286 F.Supp. 683, 684; *see* Lewis v. United States, 10 Cir. 1969, 408 F.2d 1310, 1312; Reed v. United States, 8 Cir. 1968, 401 F.2d 756, 763; United States v. Thompson, D.Del.1968, 292 F.Supp. 757, 764–765.

21. *See* Lewis v. United States, 10 Cir. 1969, 408 F.2d 1310, 1313; United States v. Thompson, D.Del.1968, 292 F. Supp. 757, 765; United States v. Casson, D.Del.1968, 288 F.Supp. 86, 89. *See also* United States v. Stevens, D. Minn.1968, 286 F.Supp. 532, 536. *But cf.* DePugh v. United States, 8 Cir. 1968, 401 F.2d 346, 350–351.

22. United States v. Thompson, D.Del. 1968, 292 F.Supp. 757, 765; *see* United States v. Stevens, D.Minn.1968, 286 F. Supp. 532, 536; *cf.* DePugh v. United States, 8 Cir. 1968, 401 F.2d 346, 350–351.

196

The *Thompson* court articulated this holding in these words:

"I hold, therefore, that in order for defendant to avail himself of the privilege against self-incrimination as an absolute defense to prosecution for possession of an unlawfully made firearm, he must satisfy the court that he was the maker of the gun and that at the time it was made there was in effect a law of the jurisdiction of its making which prohibited such weapons and provided criminal sanctions. Otherwise, the Fifth Amendment privilege is no defense to this aspect of the present prosecution." 292 F.Supp. at 765.

Although the appellant in the case before us has not cited *Thompson*—in fact, he has not cited any of the post-*Haynes* cases discussed herein—he has fashioned an argument which fits *Thompson* like a glove. He contends that he cannot be subjected to criminal punishment under § 5851 for possessing a firearm made in violation of § 5821 because (1) he was the person who made the sawed-off shotgun in violation of § 5821, and (2) if he had complied with § 5821 he would have incriminated himself under a state criminal statute. The state statute to which he directs our attention is Article 489c, Section 1, of the Texas Penal Code. Although the Texas Legislature has subsequently amended this statute, the provisions of the statute at the time Marshall made the sawed-off shotgun [23] were as follows:

"It shall be unlawful for any person who has been convicted of burglary or robbery, or of a felony involving an act of violence with a firearm under the laws of the United States or of the State of Texas, or of any other state, and who has served a term in the penitentiary for such conviction, to have in his possession away from the premises upon which he lives any pistol, revolver or any other firearm capable of being concealed upon the person."

It is readily apparently that two aspects of the Texas statute make it something less than a general prohibition of possession of concealable weapons. First, the statute applies not to the public generally but only to certain persons with criminal records. Marshall, however, is apparently a person within the purview of the statute, for he tells us in his brief that he "has been convicted of burglary more than once and has served terms in the State Penitentiary for such convictions." Secondly, the statute prohibits not possession generally but only possession "away from the premises upon which he lives." This element of the statute might present a major impediment to Marshall's self-incrimination argument. It might be said that, because of this element of the statute, the incriminating link between compliance with the federal statute and a prosecution for violation of the Texas statute is too tenuous to come within the scope of the *Marchetti-Grosso-Haynes* rationale. In other words, the argument might be advanced that even if Marshall's hypothetical compliance with § 5821 would have alerted law enforcement officials that he was planning to make—and presumably possess—a sawed-off shotgun, his compliance with the federal statute would not have told anyone whether or not he was planning to possess the shotgun away from his home. However, we do not reach this issue because we perceive a more fundamental fallacy in Marshall's argument, and to that we now turn.

■ Our discussion of the fatal flaw in Marshall's Fifth Amendment argument must begin with a reiteration of

23. The statute as quoted in the text was in effect from 1957 to 1969. In 1969, however, the statute was amended by the Texas Legislature, and it now reads in pertinent part as follows:
"No person who has been convicted of a felony involving an act of violence may possess away from the premises upon which he lives a prohibited weapon [as defined by another provision of the Texas Penal Code], or a firearm having a barrel of less than 12 inches in length."

the basic rationale underlying *Marchetti, Grosso*, and *Haynes*. As noted previously, these cases stand for the proposition that where *compliance* with a criminal statute would have subjected the defendant to "real and appreciable" hazards of incrimination under other criminal legislation, his assertion of his Fifth Amendment privilege constitutes a complete defense to a prosecution for failure to comply with the statute. Thus the crux of Marshall's argument in this case is that if he had *complied* with § 5821, he would thereby have incriminated himself under the Texas statute. We find this argument totally devoid of merit. On the facts of this case, we are compelled to conclude that if Marshall had *complied* with the provisions of § 5821, he could not possibly have incriminated himself under the Texas statute because he would never have made the sawed-off shotgun at all.

It must be remembered that the statutory and regulatory scheme pertaining to the making of firearms is relatively complex; one who is complying with § 5821 must go through several steps before he is authorized to make the firearm. First, of course, he must pay the making tax. Secondly, he must file a completely executed application, and the application must be supported by a certificate of a local law enforcement official certifying that the official is satisfied that the applicant intends the firearm "for lawful purposes." 26 C.F.R. § 179.78. Then, after filing his application with the Director of the Alcohol and Tobacco Tax Division in Washington, the applicant must await the decision of the Director. *After* the application is returned to him he can legally make the firearm *if* his application has been *approved*. The Director's approval is a prerequisite to the making of a firearm in compliance with § 5821.

If for any reason a particular person is unable to receive the Director's approval, the only way he can comply with § 5821 is by *not* making the firearm. On the basis of the facts in this case, we have no choice but to conclude that Marshall was such a person, i. e., a person unable to receive the Director's approval. If he had attempted to submit an application to the Director, the only reasonable assumption we can make is that he would have been unable to supply one of the essential elements, the certificate of a local law enforcement official. It would strain the imagination to suppose that this man, with his record of convictions and incarcerations, could have persuaded a local law enforcement official to certify that he was satisfied that Marshall intended to make a sawed-off shotgun "for lawful purposes." To ask this court to reverse a conviction on the basis of such a supposition is asking too much. Perhaps we cannot say with delphic assurance that it is utterly and totally impossible that Marshall could have secured the required certificate, but we can say that such a possibility is so remote that it exists only in the realm of fanciful speculation. We cannot base a decision on a hypothesis that extends so far beyond the horizon of reasonable anticipation. The privilege against self-incrimination is not to be speculated into existence. In the words of the Supreme Court, " * * * unlikely possibilities present only 'imaginary and insubstantial' hazards of incrimination, rather than the 'real and appreciable' risks needed to support a Fifth Amendment claim." Minor v. United States, 1969, 396 U.S. 87, 97–98, 90 S.Ct. 284, 24 L.Ed. 2d 283, 292.

The ship of Marshall's surmise must founder on the shore of reality, and we must conclude that Marshall could not have obtained the required certificate. Consequently, had he been complying with the law, Marshall would have had no choice but to abandon the idea of sawing off the shotgun once he realized that he could not complete the requirements necessary for a successful application. Thus his compliance with § 5821 could not have led to incrimination under the Texas statute for the simple reason that he would never have made the sawed-off shotgun.

One possible problem remains. It might conceivably be argued that the mere filing of a partially completed application form could have incriminated Marshall under the Texas statute. The answer to this argument is obvious: If Marshall were *complying* with the statute, none of the information given on the application form could possibly incriminate him (in the absence of *approval* of his application) because he would not yet have made the firearm. Under § 5821, mere payment of the tax and filing of the application, without more, cannot constitute self-incrimination. Thus this case differs in an important respect from *Marchetti, Grosso,* and *Haynes.*[24] The difference lies in the comparative distances between the cup of disclosure and the lip of criminality in the statutory frames. In those cases the mere act of registering or paying the tax could automate criminal investigation directed toward the registrant or taxpayer. Here, however, completion of the steps necessary to constitute self-incrimination is not instantaneous with payment of the tax or filing of the application. Unless the § 5821 applicant is *violating* the requirements of the law, the information which he is required to divulge in making his application cannot tell law enforcement officials that he presently possesses a firearm; the only thing the information reveals is that the applicant is planning to make a firearm at some time in the future, i. e., *after* the Director approves his application. Therefore, so long as the applicant is *complying* with the provisions of § 5821 and the applicable regulations, no potentially harmful criminal investigation can be initiated until after the issuance of the Director's approval.

In this case we are compelled to reject appellant's contention that compliance with § 5821 would have incriminated him under the Texas statute. Since § 5821 requires approval of an application prior to making, and it is virtually inconceivable that Marshall could have received such approval, his full compliance with § 5821 would have meant *not* making the firearm. Thus he would not have been subjected to any risk of incrimination, and he therefore cannot assert a Fifth Amendment defense.

The judgment of the district court is Affirmed.

---

24. *Cf.* Varitimos v. United States, 1 Cir. 1968, 404 F.2d 1030, 1033.