UNITED STATES of America,
Plaintiff,

v.

Clyde Marvin THOMPSON, Jr.,
Defendant.

Cr. A. No. 1899.

United States District Court
D. Delaware.

Nov. 19, 1968.

758

Alexander Greenfeld, U. S. Atty., and L. Vincent Ramunno, Asst. U. S. Atty., Wilmington, Del., for the United States of America.

Thomas G. Hughes, of O'Donnell, Hughes & Lowicki, Wilmington, Del., for defendant.

## OPINION

LATCHUM, District Judge.

In a one count indictment, defendant is charged with the unlawful possession of a sawed-off shotgun in violation of 26

U.S.C. § 5851 because the weapon had been *made* in violation of 26 U.S.C. § 5821 and had been *transferred* in violation of 26 U.S.C. §§ 5811, 5814.[1] Defendant has moved to suppress evidence on the ground that it is the fruit of a search incident to an unlawful arrest, and to dismiss the indictment on the ground that § 5851 violates his Fifth Amendment privilege against self-incrimination. The government and defendant have stipulated, with regard to defendant's motion to suppress evidence, that the facts shall be determined from the testimony given before the United States Commissioner on April 25, 1968 and information contained in the police report of November 22, 1967.

The police report and the testimony of the officers before the Commissioner are not entirely consistent. But upon reading both, and giving deference to the fact that the police report is somewhat abbreviated, the testimony, though remote in time from the incident, is more descriptive and complete. Thus the essential facts surrounding defendant's apprehension may be summarized as follows:

On November 22, 1967, shortly before 5:30 a. m. Officers Hedrick and Lehowit of the Wilmington Police Department were driving in a police truck north on Market Street in Wilmington when they observed defendant sitting in his automobile which was parked on the premises of a service station at the corner of Thirtieth and Market Streets. The officers were suspicious of defendant due to the early hour of the morning and the fact that his car was facing the street and was not located near the gas pumps, the station's office or rest rooms. Of-

ficer Hedrick also recognized the defendant as a man who had been arrested approximately two weeks before for driving a motor vehicle without a driver's license. The officers parked their vehicle in a position to observe the defendant. Apparently, when the defendant saw the police, he hurriedly entered his car and drove east on Thirtieth Street. The police followed defendant for some distance observing that he entered a one-way street and drove in the wrong direction for approximately 50 to 75 feet. They also noticed that defendant's car emitted an excessively loud noise due to an apparently defective muffler and that his windshield contained several holes stuffed with some paper materials, all in violation of the Delaware Motor Vehicle Code. 21 Del.C. §§ 4309, 4311.

As they were following defendant's car the officers communicated with police headquarters by radio, informing the central office of their actions and requesting that a second police vehicle be assigned to "cover" their apprehension of the defendant. When they were joined by Sergeant Curtis they stopped defendant's vehicle at Eleventh and Bennett Streets. The police truck parked behind defendant's car and Sergeant Curtis positioned his car in front of defendant's vehicle to reduce the possibility of escape. The three officers approached defendant on the left side of his car and Officer Hedrick asked defendant to produce his driver's license and automobile registration. When defendant, who was alone in the vehicle, showed only a "learner's permit" which requires that a licensed driver be with the permittee in the car, 21 Del.C. § 2708, defendant was

---

1. No issue of duplicity has been raised in this case for it appears from a fair reading of its language that the charge specifies only one criminal offense, i. e. unlawful possession of a sawed-off shotgun in violation of 26 U.S.C. § 5851. The unlawfulness of the possession is based on the alleged illegal making and illegal transfer of the firearm. While it is clear that § 5851 establishes separate offenses for possession of an unlawfully made and possession of an unlawfully transferred firearm, United States v. Hardgrave, 214 F.2d 673 (C.A.7, 1954); Montgomery v. United States, 146 F.2d 142, 143 (C.A. 4, 1944), these two separate provisions of § 5851 are not pleaded in the indictment as two separate offenses, but are referred to only as two foundations for the single offense of unlawful possession of the firearm. Thus, no question of duplicity is involved. See United States v. Ricciardi, 40 F.R.D. 135, 136 (S.D.N.Y., 1965).

formally arrested for driving a motor vehicle in violation of his learner's permit.

Defendant was seated in the front seat of his car during this time and after Officer Hedrick informed defendant that he was under arrest and advised him of his constitutional rights, Hedrick observed defendant reaching his right hand between his legs and under his seat. The officer saw that defendant had his hand on the butt of a gun and that he was attempting to pull it from under the seat. He immediately recognized the weapon as a sawed-off shotgun. Hedrick told Curtis "He is going for something" whereupon the sergeant removed defendant from the vehicle. Officer Hedrick then retrieved the gun from the car. Defendant attempted to escape but was subdued by Sergeant Curtis. Numerous charges were thereafter placed against defendant at Central Headquarters in addition to the learner's permit violation, including driving a motor vehicle with improper equipment. The shotgun, which is the subject matter of the present prosecution, was fully loaded with the safety off at the time it was found. It measured 25 inches in length with a double barrel 16¼ inches long and thus is within the statutory definition of a "firearm" under the National Firearms Act. 26 U.S.C. § 5848(1).

## I. MOTION TO SUPPRESS EVIDENCE

■■ The basis for defendant's motion to suppress evidence is that the police arrested defendant without a warrant when they directed him to stop his vehicle and that the arrest was made without probable cause. Defendant claims that the police obtained the shotgun through a search incident to an unlawful arrest, thus requiring suppression of the weapon as evidence and any other material gathered as a result of the arrest. At oral argument the government conceded, for the purposes of the present motion, that the arrest took place at the time the police stopped defendant's automobile. The question of when an arrest takes place, particularly in motor vehicle cases, is a most difficult one, subject to a diversity of opinion.[2] In

2. The essential problem is attempting to distinguish between an arrest and a "mere" detention. Some courts are willing to find an arrest virtually whenever a person is subjected to the authority of the police and restricted in his freedom of movement. See Robertson v. State, 184 Tenn. 277, 198 S.W.2d 633 (1947). The District of Columbia Circuit finds an arrest "where a person is taken into custody or restrained of his full liberty, or where the detention of a person in custody is continued even for a short period of time." Long v. Ansell, 63 App.D.C. 68, 69 F.2d 386, 389, 94 A.L.R. 1466 (1934); Morton v. United States, 79 U.S. App.D.C. 329, 147 F.2d 28, 30 (1945), cert. den. 324 U.S. 875, 65 S.Ct. 1015, 89 L.Ed. 1428; see United States v. Scott, 149 F.Supp. 837, 840 (D.D.C.1957). The Supreme Court has even found an arrest based upon the concept of deprivation of freedom: "When the officers interrupted the two men and restricted their liberty of movement, the arrest, for purposes of this case, was complete." Henry v. United States, 361 U.S. 98, 103, 80 S.Ct. 168, 171, 4 L.Ed.2d 134 (1959); cf. Rios v. United States, 364 U.S. 253, 261–262, 80 S.Ct. 1431, 4 L.Ed.2d 1688 (1960). Although the Court has recently viewed the traditional concept of arrest as a "seizure" of a person which results in "a trip to the station house and prosecution for crime," it clearly stated that the Fourth Amendment governs seizures of persons which do not constitute the traditional arrest and, applying the restraint of freedom concept, the Court added that "whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." Terry v. Ohio, 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968).

Other courts, including the District of Columbia Circuit, have ruled that some "detentions" are not arrests and have found the demands of the Fourth Amendment less rigid as to such detentions. Gilbert v. United States, 366 F.2d 923 (C.A.9, 1966) (brief detention, when arrest not justifiable, permitted when based on reasonable grounds and when not arbitrary or harassing); Brown v. United States, 125 U.S.App.D.C. 43, 365 F.2d 976 (1966) (police may question person though questioning may involve momen-

the absence of a controlling federal statute, the nature of an arrest is determined by the law of the state where the "seizure" of the defendant took place. See Busby v. United States, 296 F.2d 328, 331 (C.A. 9, 1961). It is not necessary, however, to decide here whether the stopping of defendant's vehicle satisfies the Delaware definition of an arrest.[3] By ordering defendant to stop his automobile and by positioning their vehicles in such a manner that defendant's car could proceed no further, the police effectively deprived defendant of his freedom or liberty in a significant way. If at the time the police had "probable cause" to take this action, the detention was lawful regardless of whether it is considered an arrest or a mere investigatory detention.

 "Probable cause exists when 'the facts and circumstances within * * * [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." Brinegar v. United States, 338 U.S. 160, 162, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949), quoting Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1924). The arresting officers are not required to develop the degree of proof necessary for a conviction before they can act. Henry v. United States, 361 U.S. 98, 102, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); United States v. Gaither, 209 F.Supp. 223, 224 (D.Del.1962). Probable cause, which will sustain a warrantless arrest, is found somewhere between suspicion and sufficient evidence to convict. United States v. Margeson, 259 F.Supp. 256, 263 (E.D.Pa.1966). In the case of a warrantless arrest the police have the burden of demonstrating its

validity. Beck v. Ohio, 379 U.S. 89, 97, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); Rouse v. United States, 123 U.S.App.D.C. 348, 359 F.2d 1014, 1016 (1966). In this case, however, I am convinced that the evidence amply shows that they had sufficient probable cause to make an arrest without a warrant and that they acted lawfully under their authority to arrest "for violation of the motor vehicle and traffic laws of [Delaware] * * * upon view and without warrant * * *." 21 Del.C. § 701.

██ ██ The initiation of the surveillance of defendant by the police may have been based on curiosity or, at most, suspicion that defendant was engaged in some questionable endeavor. Of course, suspicion alone is not a sufficient ground to support an arrest. Mallory v. United States, 354 U.S. 449, 454, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957); Henry v. United States, 361 U.S. 98, 101, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959). In fact, under the construction which the Delaware Supreme Court has placed on the language of the state's investigative detention statute, 11 Del.C. § 1902, it appears that, although "reasonable suspicion" was designed by the legislature as the proper basis for an investigatory "stop", the minimum standard for such detention is probable cause or, as the court termed it, "reasonable belief." DeSalvatore v. Delaware, 2 Storey 550, 163 A.2d 244, 249 (1960); see Note, The Law of Arrest: Constitutionality of Detention and Frisk Acts, 59 Nw.U.L.Rev. 641, 645, 647 (1964). It appeared to the officers, according to the testimony of Officer Lehowit, that defendant's "hurried" departure from the service station was induced by the sight of the officers observing him and that his acts, particularly in driving the wrong way down a one-way street, were intended as evasive. See

tary detention); Wilson v. Porter, 361 F. 2d 412 (C.A.9, 1966) (brief detention for purposes of limited inquiry in course of routine investigation not unconstitutional when founded on some basis from which court can determine detention was not arbitrary or harassing); Busby v.

United States, 296 F.2d 328 (C.A.9, 1961) (no arrest when car stopped for motor vehicle code violation).

3. " 'Arrest' is the taking of a person into custody in order that he may be forthcoming to answer for the commission of a crime * * *." 11 Del.C. § 1901.

Sibron v. New York, 392 U.S. 40, 66–67, 88 S.Ct. 1889, 1912, 20 L.Ed.2d 917 (1968). There can be no doubt that Officer Hedrick's knowledge of defendant's prior arrest for driving without a license weighed heavily on the officers' minds as they were following defendant and they clearly suspected that he was driving without a license at this time as well. However, by the time they signaled to defendant to stop they had actually observed three infractions of the Delaware Motor Vehicle law, any one of which would constitute probable cause to stop defendant, whether or not such a stop should be termed an "arrest." See Bell v. United States, 102 U.S.App.D.C. 383, 254 F.2d 82 (1958).

▮▮▮▮ Having ruled the detention or arrest lawful and valid I find that the evidence seized incidentally to that event need not be suppressed because it was obtained in a legitimate fashion. After stopping the defendant and while the police officers were conversing with him about his unlawful use of the learner's permit, Officer Hedrick observed defendant attempting to pull a sawed-off shotgun from under the front seat of the car in which he was sitting. Hedrick testified that before any action was taken to remove defendant from the car and seize the weapon he actually saw about 20 inches of the 25 inch gun and immediately recognized it as a sawed-off shotgun. Officer Lehowit also saw the gun protruding from under the seat when Hedrick called it to his attention. Their view of the weapon was not the result of any search. The subsequent seizure of the gun was justified under what is known as the "open view" doctrine: "objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." Harris v. United States, 390 U.S. 234, 236, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067 (1968); Ker v. California, 374 U.S. 23, 42–43, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963). Furthermore, the Supreme Court has recently indicated in the clearest terms that the safety and pro-

tection of police officers in confrontations with criminal suspects is a principal consideration and that this interest can, in the appropriate circumstances when the police reasonably believe they are in danger, justify a limited search for concealed weapons. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In the instant case no limited search was necessary, though probably justified, because defendant's action brought the weapon clearly into open view. The seizure of the loaded shotgun was lawful and it will not be suppressed as evidence. Also, the one unspent shotgun shell discovered under the seat of the car was obtained through a search incident to a lawful arrest and is therefore admissible as evidence. Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947). Finally, the learner's permit was voluntarily delivered to the officers by defendant upon their request and, therefore, cannot be subject to suppression under the requirements of the Fourth or Fourteenth Amendments. The motion to suppress evidence will be denied.

## II. MOTION TO DISMISS INDICTMENT

Defendant has also moved that the indictment be dismissed on the basis of the approach taken by the Supreme Court in Haynes v. United States, 390 U.S. 85, 88 S.Ct. 722, 19 L.Ed.2d 923 (1968). He argues that to permit this prosecution in spite of his asserted reliance upon the privilege against compulsory self-incrimination as a defense would violate the Fifth Amendment. This contention is based on defendant's theory that the requirements of the *making* and *transfer* sections of the National Firearms Act, 26 U.S.C. §§ 5811, 5814, 5821, are substantially the same as the *registration* provision of the Act, 26 U.S.C. § 5841. In *Haynes* the Supreme Court ruled that prosecutions under § 5851 for possession of an *unregistered* firearm are subject to the absolute defense of the privilege

against self-incrimination and defendant urges that the same should be true for prosecutions for *possession* of an unlawfully *made* or *transferred* firearm.

Prior to *Haynes,* which was decided earlier this year, the federal courts were apparently unanimous in holding that the *making* provisions of the Act are constitutional and do not violate the Fifth Amendment privilege against self-incrimination.[4] However, since the day *Haynes* was delivered along with its fellow landmark cases, Marchetti v. United States, 390 U.S. 39, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968) and Grosso v. United States, 390 U.S. 62, 88 S.Ct. 709, 19 L.Ed. 2d 906 (1968), a conflict of opinion has developed over whether prosecution for possession of an unlawfully *made* firearm is subject to the privilege against self-incrimination. Compare United States v. Stevens, 286 F.Supp. 532 (D.Minn. 1968), with United States v. Taylor, 286 F.Supp. 683 (E.D.Wis. 1968). Prosecutions for possession of unlawfully *transferred* firearms have not, until now, come under constitutional attack, but the time is ripe for a careful consideration of these two related provisions of § 5851 in light of the *Haynes* decision.[5]

Section 5841 (the subject of the *Haynes* case) requires the possessor of a firearm to *register* certain information with the Secretary of the Treasury, but it exempts those possessors who have lawfully made the weapon or have received it in a lawful transfer. In effect, this registration statute requires that those who have unlawful possession of a firearm in violation of § 5851's making or transfer clauses give notice of that fact to the government and thereby incriminate themselves. Of course, "there are situations * * * in which a possessor who has not violated the Act's other provisions is obliged to register." Haynes v. United States, 390 U.S. 85, 96–97, 88 S.Ct. 722, 730, 19 L.Ed.2d 923 (1968). These situations are aptly described, however, as "uncommon." [6] The Supreme Court found that

> the correlation between obligations to register and violations can only be regarded as exceedingly high, and a prospective registrant realistically can expect that registration will substantially increase the likelihood of his prosecution. Moreover, he can reasonably fear that the possession established by his registration will facilitate his prosecution under the making and transfer clauses of § 5851. In these circumstances, it can scarcely be said that the risks of criminal prosecution confronted by prospective registrants are "remote possibilities out of the ordinary course of law" * * * ; yet they are compelled, on pain of criminal prosecution, to provide to the Secretary both a formal acknowledgment of their possession of firearms, and supplementary information likely to facilitate their arrest and eventual conviction. The hazards of incrimination created by the registration requirement can thus only be termed "real and appreciable."

Haynes v. United States, 390 U.S. at 97, 88 S.Ct. at 730.

Any individual who wishes to make a weapon, within the meaning of § 5821(a), is obliged, "prior to such

---

4. Sipes v. United States, 321 F.2d 174 (C.A.8, 1963); Mares v. United States, 319 F.2d 71 (C.A.10, 1963); Russell v. United States, 306 F.2d 402 (C.A.9, 1962); United States v. Fleish, 227 F. Supp. 967 (E.D.Mich.1964).

5. The constitutionality of a prosecution for possession of an unlawfully transferred firearm was an issue in a case decided in this district earlier this year, but that portion of the opinion which found such action subject to the privilege against self-incrimination as a complete bar to

prosecution was subsequently withdrawn by the court upon the government's motion for reconsideration. United States v. Casson, 288 F.Supp. 86, Cr.A. No. 1890 (D.Del., filed June 26, 1968, withdrawn in part August 14, 1968).

6. As an example of uncommon situations, the government cited "the position of a finder of a lost or abandoned firearm." Haynes v. United States, 390 U.S. 85, 96, n. 10, 88 S.Ct. 722, 730, 19 L.Ed.2d 923 (1968).

making," to declare his intention to the Secretary, and to provide to the Treasury his fingerprints and photograph. 26 U.S.C. § 5821(e); Treas. Reg. § 179.78. * * * Any person who wishes to transfer such a weapon may lawfully do so only if he first obtains a written order from the prospective transferee on an "application form issued * * * for that purpose by the Secretary." 26 U.S.C. § 5814(a). The application, supported by a certificate of the local chief of police, and accompanied by the transferee's fingerprints and photograph, must be approved by the Secretary prior to the transfer. Treas.Reg. §§ 179.98, 179.99.

Id. at 88–89, 88 S.Ct. at 726.

The crux of the matter before this Court is whether or not the declarations required by the *making* and *transfer* sections of the statute are substantially similar to the *registration* requirement in their incriminatory effect. The question in *Haynes* was "whether satisfaction of petitioner's obligation to register under § 5841 would have compelled him to provide information incriminating himself." 390 U.S. at 90, 88 S.Ct. at 726. The same question must now be asked and answered regarding compliance with the making and transferring provisions, §§ 5811, 5814, and 5821.

The government attaches a great deal of significance to the fact that § 5851 proscribes *possession* of a firearm which *"at any time"* had been illegally *made* or *transferred.* It relies upon a discussion in *Haynes* of the difference between the making and transfer provisions of § 5851 and the registration clause of that section as the basis for an argument that "a distinction must be made between an offense involving an illegally transferred or made weapon under §§ 5811, 5814, or 5821, and a charge as in the instant case which alleges a violation of § 5851." In *Haynes,* the government had argued that the § 5851 sanction on failure to *register* a firearm was directed at firearms which had never been registered by any prior possessor, while § 5841 imposed a registration obligation only on the present possessor of the weapon. 390 U.S. at 91, 88 S.Ct. 722. The Court, however, found that in light of the absence of the language "at any time" in the § 5851 registration clause, in addition to the legislative history of the statute, "Congress intended the registration clause of § 5851 to incorporate the requirements of § 5841, by declaring unlawful the possession of any firearm which has not been registered by its possessor, in circumstances in which § 5841 imposes an obligation to register." 390 U.S. at 94, 88 S.Ct. at 729. Apparently, the government's argument was an attempt to show that § 5851 operated only against possession, imposed no obligation on the defendant to register, and therefore was not subject to any charge of compulsory self-incrimination.

A similar position is taken by the government in this case and *Haynes* appears to support the contention that with regard to the making and transfer requirements there is a distinction between §§ 5811, 5814, and 5821 (and § 5851. See Haynes v. United States, supra, at 92, 88 S.Ct. 722. Section 5851 does, indeed, proscribe receipt or possession of an unlawfully made or transferred firearm and the possessor may be convicted without having personally violated either the making or transfer provisions of the Act. As long as he has unexplainable receipt or possession of a firearm and that weapon was unlawfully made or transferred at some time by some one, he is guilty of violating § 5851. However, defendant may be the maker or transferee whose failure to comply with the making or transfer requirements (§§ 5811, 5814 and 5821) caused his own possession of the firearm to be violative of § 5851. This possibility must be distinguished from the possibility that defendant's possession of the weapon is unlawful due to some *prior* possessor's failure to comply with §§ 5811, 5814, or 5821. If the prosecution under § 5851 is based on violation of the making or transfer sections by someone other than defendant

then no self-incrimination issue is involved which defendant has standing to raise. However, if defendant's alleged possession of the firearm is unlawful due to his own failure to comply with the *making* or *transfer* provisions then the *Haynes* rationale may be applicable and the question must be asked whether satisfaction of defendant's obligation under either the making or the transfer requirements "would have compelled him to provide information incriminating himself." Haynes v. United States, supra at 90, 88 S.Ct. at 726.

Assuming that defendant unlawfully *made* the firearm which was found in his possession it is established in this district, United States v. Casson, Cr.A. No. 1890, 288 F.Supp. 86 (D.Del., June 26, 1968), and generally considered to be the rule that the privilege against self-incrimination is no defense to this prosecution. See Sipes v. United States, 321 F.2d 174 (C.A. 8), cert. denied, 375 U.S. 913, 84 S.Ct. 208, 11 L.Ed.2d 150 (1963); Mares v. United States, 319 F.2d 71 (C.A. 10, 1963); Russell v. United States, 306 F.2d 402 (C.A. 9, 1962); United States v. Taylor, 286 F.Supp. 683 (E.D.Wis.1968); but see United States v. Stevens, 286 F.Supp. 532 (D.Minn. 1968). If, however, there was a law in effect at the time the gun was made in the jurisdiction where the firearm was made which prohibited sawed-off shotguns, then the Fifth Amendment privilege should be available to the maker of the gun as an absolute defense to a § 5851 charge of possession of a firearm made in violation of § 5821 because compliance with the making provisions of § 5821 would have incriminated him under that State's laws even though a federal law

would not have been violated by the making. "The argument that a manufacturer by complying with § 5821, paying the tax and filing the declaration of intent to manufacture, absolves himself from a [federal] violation because of his compliance overlooks the fact that he thereby incriminates himself under state statutes or other regulatory measures * * *." United States v. Stevens, 286 F.Supp. at 536. However, in the absence of any possibility of incriminating himself under state law, defendant cannot assert the privilege against self-incrimination as an absolute defense to the charge of possession of an unlawfully made firearm because in that case "[c]ompliance with § 5121 * * * establishes the legality, rather than illegality of possession of a firearm" and "no past or present incriminating implication could flow from his compliance with § 5121." [7] United States v. Casson, Cr.A. No. 1890 at 8, 288 F.Supp. 86, 89 (D.Del., filed June 26, 1968).

■ I hold, therefore, that in order for defendant to avail himself of the privilege against self-incrimination as an absolute defense to prosecution for possession of an unlawfully made firearm, he must satisfy the court that he was the maker of the gun and that at the time it was made there was in effect a law of the jurisdiction of its making which prohibited such weapons and provided criminal sanctions. Otherwise, the Fifth Amendment privilege is no defense to this aspect of the present prosecution.

Turning now to the transfer provisions of §§ 5811 and 5814, if defendant is the transferee who received the shotgun through a transfer in violation of §§ 5811, 5814, then he should be able to

---

7. Of course, if the government were not to approve an application for making a weapon, then to proceed to make it would violate § 5821 and the possession of that firearm would violate § 5851. It may be argued that requiring a declaration of intent to make a firearm tends to incriminate under § 5851 if the firearm is not authorized but the applicant proceeds to make it anyway. "The central standard for the privilege's application has

been whether the claimant is confronted by substantial and 'real,' not merely trifling or imaginary hazards of incrimination." Marchetti v. United States, 390 U.S. 39, 53, 88 S.Ct. 697, 705, 19 L.Ed. 2d 889 (1968). At most, one who complies with § 5821 incurs a risk of incrimination under § 5851 which is "speculative and unsubstantial." United States v. Casson, Cr.A. No. 1890 at 10, 288 F.Supp. 86, 90 (D.Del., filed June 26, 1968).

raise his Fifth Amendment privilege as an effective defense in bar against prosecution for possession of an illegally transferred firearm *with respect to that particular transfer*. Under the statutory scheme, the transferee is burdened with practically the same disclosure-seeking obligations as is the transferor.

For example, section 5811(a) imposes a tax on the transfer of firearms and under § 5811(b), if the tax is not paid by the transferor prior to the transfer, the transferee becomes jointly and severally liable with the transferor for the assessment. Section 5814 permits the transfer only after the transferee has executed a written order to the transferor on an application form issued by the government and upon approval by the Director, Alcohol and Tobacco Tax Division, Treasury Department, of the application which must be signed by both the transferor and transferee. 26 C.F.R. § 179.98 (1967). The application must identify the transferee, and, if the transferee is an individual, his identification must include fingerprints, a photograph, and a certificate by a police authority stating that the transferee desires the weapon for lawful purposes. Id. at § 179.99.

If the transferee complies with the statutory requirements he assumes a risk of incrimination which is both substantial and real. Unlike the making requirements of the statute, the application and approval procedure for transferring a firearm does not establish the federal legality of the intended possession of the firearm. At most, the pre-transfer procedure simply establishes *the legality of that particular transfer*. See 26 C.F.R. § 179.98—.100 (1968). The legality or illegality of *possession* of the firearm is determined by § 5851, since the weapon may have been illegally made or previously illegally transferred. Even if permission to consummate the transfer is denied, the detailed information which the prospective transferee has been required to file with the government, in view of the "inherently suspect" nature of the application, "might * * * at

least supply investigatory leads to a criminal prosecution." Albertson v. SACB, 382 U.S. 70, 78, 86 S.Ct. 194, 198, 15 L.Ed.2d 165 (1965). To paraphrase from *Marchetti*, the hazards of incrimination created by §§ 5811 and 5814 as to future possessions of firearms are not trifling or imaginary. Prospective transferees can reasonably expect that application for approval of the transfer and payment of the transfer tax will significantly enhance the likelihood of their prosecution for future possession, and that it will readily provide evidence which will facilitate their convictions. Marchetti v. United States, 390 U.S. 39, 54, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968). This is easily apparent when it is recognized that, on the whole, information sought by the National Firearms Act is "directed at a highly selective group inherently suspect of criminal activities." Haynes v. United States, 390 U.S. 85, 98, 88 S.Ct. 722, 731, 19 L.Ed.2d 923 (1968), quoting Albertson v. SACB, 382 U.S. 70, 79, 86 S.Ct. 194, 15 L.Ed.2d 165 (1965).

However, sections 5811 and 5814 are not so blatantly violative of the privilege against self-incrimination as the *Haynes* Court found § 5841 to be. This is due to the fact that § 5841's registration requirement "is * * * directed principally at those persons who have obtained possession of a firearm without complying with the Act's other requirements, and who therefore are immediately threatened by criminal prosecution under §§ 5851 and 5861." Haynes v. United States, 390 U.S. at 96, 88 S.Ct. at 730. The transfer sections, on the other hand, apply to nearly all transfers of firearms and are not so constructed as to necessarily require incriminatory disclosures as a general rule. The nonincriminatory disclosure, which *Haynes* found to be intentionally "uncommon" under § 5841, is sought by §§ 5811 and 5814 without any apparent discrimination in favor of obtaining the incriminatory statement. Therefore, the privilege against self-incrimination must be applied in this case in a more limited fashion than was done in *Haynes*.

It is the holding of this court that the Fifth Amendment privilege against compulsory self-incrimination is a limited, not absolute, defense to a prosecution under § 5851 for possession of a firearm *transferred* in violation of §§ 5811 and 5814. The privilege will bar a prosecution only when the alleged unlawful transfer involved defendant as transferee and then only when it appears to the court that defendant's compliance with the transfer statute would, in all probability, have been incriminatory. In the instant case, since the record at this juncture does not show that compliance with the transfer provisions by defendant would have been incriminatory and that the transfer involving defendant as transferee, if there was one, was the only illegal transfer of the shotgun "at any time," the motion to dismiss the indictment in this respect must be denied. This in no way prevents defendant from raising the defense at trial by demonstrating that as a transferee he would have been required to incriminate himself in complying with the transfer statute either because the firearm had originally been unlawfully made, had previously been unlawfully transferred, or was prohibited by state law or some other criminal sanction. The government would then be barred from prosecuting under § 5851 on the basis of that particular unlawful transfer. In order to obtain a conviction for possession of an unlawfully transferred firearm the prosecution would have to prove that the weapon had been *otherwise* transferred unlawfully "at any time."

Finally, defendant contends that the indictment should be dismissed because § 5851 violates the Fifth Amendment by requiring that, once possession and the unlawful making or transfer are proven, defendant must explain his possession of the firearm to the satisfaction of the jury in order to avoid conviction. His argument is that the statute creates an unreasonable presumption. See United States v. Romano, 382 U.S. 136, 86 S. Ct. 279, 15 L.Ed.2d 210 (1965); Tot v. United States, 319 U.S. 463, 63 S.Ct. 1241, 87 L.Ed. 1519 (1943). The merits of this argument need not be decided at this time because the language in question may never become an issue in this case if the government does not request a jury instruction in accordance with that language, and if such an instruction should be requested the issue of its constitutionality can be raised and decided at that time. See Starks v. United States, 316 F.2d 45, 46 (C.A. 9, 1963). The motion to dismiss on the ground that § 5851 creates an unconstitutional presumption of guilt is, therefore, denied.

Present order in accordance with this opinion.