**UNITED STATES of America,**
**Plaintiff,**

v.

**Charles Patrick CARNEY et al.,**
**Defendants.**

**Crim. A. No. 2082.**

United States District Court,
D. Delaware.
May 21, 1971.

F. L. Peter Stone, U. S. Atty., Richard D. Levin, Asst. U. S. Atty., Wilmington, Del., for plaintiff.

Edward Z. Sobocinski, Wilmington, Del., for defendant Carney.

Oliver V. Suddard, Wilmington, Del., for defendant Sturm.

Frank O'Donnell, O'Donnell, Hughes & Lowicki, Wilmington, Del., for defendant Blandford.

C. Waggaman Berl, Jr., Booker, Leshem, Green, Shaffer, Berl & Wise, Wilmington, Del., for defendant Mahon.

## OPINION

STAPLETON, District Judge.

This matter is currently before me on motions by defendants Carney and Mahon to suppress certain evidence which they claim has been obtained in violation of their constitutional rights. From the lengthy and often conflicting testimony I find the following facts.

## FINDINGS OF FACT

On Friday, November 6, 1970, Special Agent Lundgren of the FBI interviewed James D. Weiss, the security officer of the Farmers Bank of the State of Delaware. Weiss advised him (1) that a checking account had been opened with his bank in the name of Clinton C. Frank, (2) that on November 6, 1970, a white male, identifying himself as Clinton C. Frank and accompanied by a white female, had deposited two checks in that account, (3) that both checks were drawn on the account of a Pennsylvania based corporation (American Financial Management Corp.) in a Pennsylvania bank (Fidelity Bank) to the order of Clinton C. Frank, (4) that both were produced by use of a checkwriting machine and (5) that he (Weiss) had called the corporation on which the checks were drawn and had been informed that they were part of a group of checks that had been stolen from the firm in a burglary. Weiss gave Agent Lundgren a description of both the white male and the white female. An arrest warrant for Clinton C. Frank on a charge of interstate transportation of stolen checks was then obtained.

During the evening of November 6, 1970, Lundgren received a telephone call from Weiss. Weiss advised him that the same individual, identifying himself as Clinton C. Frank, had attempted to cash a check on the Farmers Bank account and that, because the bank's staff recognized him from the previous occasion, a teller had been sent out of the bank and had observed the man and woman get into a black Mercury with a Pennsylvania license plate. The teller was also able to get the license number of this car. As a result of Weiss' telephone call, the FBI called motels in the Wilmington and Newark area requesting that the FBI be notified if persons fitting the description given and/or this automobile appeared. The FBI ascertained from the National Crime Information Center that a Mercury with the license number obtained by the teller had been stolen from Philadelphia.

Sometime prior to 8:00 A.M. on Saturday, November 7, 1970, Mr. Hickey, the manager of the Holiday Inn Motel in Newark called the Baltimore office of the FBI and reported that the two individuals fitting the descriptions and driving a Mercury with the same Pennsylvania license number had registered in his motel under the name of T. T. Cromley. The Baltimore office relayed this information to Agent Snyder at his home in Wilmington at approximately 8:00 A.M. on November 7, 1970, and Snyder called Hickey directly. Hickey further advised Snyder that the white male, after registering, had called from his room and said there was an associate of his at the motel who wanted a room. An individual then came over and, after identifying himself as Clinton C. Frank, registered in a room on the second floor.

The FBI set up surveillance at the motel at approximately 10:00 A.M. Upon arriving they were advised that the white male and white female, later identified as defendants Carney and Sturm, were registered in Room 147 and the other male, later identified as de-

fendant Mahon, was registered in Room 249 on the second floor.

Agents Lundgren and Snyder occupied Room 145 immediately adjacent to Room 147. Agent Wedge stayed in the motel office and was in contact with Snyder and Lundgren by phone. Other agents were posted around the motel. Mahon ordered breakfast and it was taken to him by Agent Hyden, who acted as though he were a motel employee.

A white Volkswagen automobile arrived and a person, later identified as defendant Blandford, emerged and entered Room 147. The FBI immediately determined through the National Crime Information Center that this Volkswagen was reported stolen in Philadelphia on November 2. Shortly thereafter, defendant Mahon arrived at the door to Room 147 and was admitted. While Agents Snyder and Lundgren could not from their vantage point see from where this caller came, they were informed by another agent on the telephone that it was the man registered in Room 249 as Clinton C. Frank.

Shortly thereafter Blandford and Mahon left Room 147, went to the Volkswagen and removed a cardboard box which, in the opinion of the agents, was the size of a box that might contain a checkwriter. This box was placed on the hood of the Mercury outside Room 147. Blandford then drove away in the Volkswagen.

Mahon then briefly re-entered Room 147 and, upon emerging, transferred the cardboard box from the hood of the Mercury to the back of a blue Oldsmobile which had been parked nearby during the entire period of the surveillance. Mahon covered the box with clothing and then drove around towards the office of the motel. Lundgren and Snyder called Wedge and Wedge directed the other agents who were present to stop and apprehend Mahon on the arrest warrant for interstate transportation of stolen checks. Mahon was so arrested.

A few minutes later, Carney and Sturm emerged from Room 147. Carney was carrying a gray attache case. He approached the Mercury and unlocked the driver's door. Sturm went to the passenger's side. At that point, Agents Lundgren, Snyder and Leonard emerged and arrested them for interstate transportation of a stolen motor vehicle. Carney threw the keys and attache case in the car. Agent Lundgren took custody of Carney. Agent Snyder took custody of Sturm and put her handbag on the hood of the car on the passenger's side. Sturm was taken around to the driver's side of the vehicle by Agent Snyder and she and Carney were placed side by side. Agent Snyder advised them orally of their rights. There was a body search of Carney to determine if he had any guns or weapons on him. Agent Snyder picked the attache case and car keys up from the floor of the car and placed them on the hood of the car on the driver's side. Sturm then moved back around to the passenger's side of the vehicle. She grabbed her purse and pulled out a piece of paper. When ordered to hand the paper over she refused and proceeded to tear it up. Snyder attempted to obtain the piece of paper from her and there was a scuffle in which Snyder was struck by Sturm.

Shortly thereafter, Sturm fell to the ground and had some kind of "fit." An ambulance was called for her and Lundgren and Snyder waited with Carney and Sturm for the ambulance and for Sgt. Leonard who had left immediately after the arrest to secure transportation back to the FBI office.

Agent Snyder instructed Agents Leonard and Lundgren immediately after the arrest not to open the attache case, that he had seized it as evidence, and that they would obtain a search warrant. He thereafter instructed other law enforcement officers who came to the scene not to open the case. Agent Snyder took the case with him from the motel to the FBI office where he locked it in a file cabinet.

The arrest of Carney and Sturm took place at 12:20 P.M. The agents arrived

back at the FBI office with Carney, Sturm and Mahon at 1:15 P.M. Agent Snyder recorded this time and the other times hereafter referred to in a log book on November 7, 1970. These three defendants were taken to the FBI office in order to process them (i. e. photographing, fingerprinting and getting descriptive information from them) and then "if time permitted" to interview them.

Upon arrival Snyder advised Carney of his constitutional rights. He gave Carney a waiver form to sign and Carney read it. He refused to sign, however. Snyder asked him whether he understood his rights and Carney replied in the affirmative. Snyder then asked him whether he had any objection to answering questions and Carney replied that he did not. Snyder then proceeded to get background and description information. This was concluded at approximately 1:30. From 1:30 to 2:55 P.M. Snyder interviewed Carney.

Shortly after they reached the FBI office, Carney inquired as to what would be done with the attache case and Snyder said that it would be maintained in his custody until a search warrant was obtained. Carney said "What the hell for, you already looked in it?" Snyder immediately responded that he had not looked in it and Carney said, "No, you didn't, but one of those other guys did." Snyder then asked him to identify whom he was talking about, either by name or general description. Carney was unable to supply either a name or even a general description.

When Snyder first started talking to Carney, Carney said that it would save Snyder a lot of time if he would call an Agent York in the Philadelphia office of the FBI, whom Carney had worked with in the past and who would "explain everything". Agent Snyder called Philadelphia but Agent York was not in the office. One of the other Philadelphia agents finally reached York, called back, and said that there was no foundation for what Carney had said. Agent Snyder relayed this information to Carney and he responded cooperatively

thereafter. He answered all of the questions asked, although he gave several different accounts which he changed later in the course of the interview. During the interview, Carney admitted that he had opened the account in the name of Clinton C. Frank and that he had hired the other people who had been with him at the motel to obtain merchandise for him by the use of worthless checks.

During the time that Carney was being interviewed, the FBI contacted and brought Miss Beth Bryson, a teller from the Farmers Bank, into the FBI office. She entered the room where Carney was being interviewed by Snyder and identified Carney as the man who had dealt at the Farmers Bank as Clinton C. Frank. No one other than Snyder and Carney were in the room at the time.

When the three defendants were brought to the FBI office in the Federal Building, no federal magistrate or commissioner was available. The FBI advised the United States Attorney's office of the need of a state magistrate to conduct a hearing and the defendants were interviewed while the FBI was awaiting word on where to take the defendants. As soon as the FBI was informed to take them to a local magistrate's court on the Philadelphia Pike, they proceeded to do so. They departed for the magistrate's court at 4:05 P.M. Carney appeared before the magistrate at 5:06 P.M. At the magistrate's office, the United States Attorney talked on the telephone with a lawyer about this case. This may have been the result of a request of one of the defendants for counsel made at that time. No request for an attorney was made by Carney prior to that time.

On Sunday, November 8, 1970, the FBI obtained warrants to search the Volkswagen, the Oldsmobile, Room 147 and the attache case. These were searched during that day. A checkwriting machine was found in a cardboard box in the back of the Oldsmobile under some clothing. A credit card in the name of Tellis T. Cromley was found in the

Volkswagen. A number of blank personal checks on the account of Clinton C. Frank in the Farmers Bank as well as a number of blank checks from the Fidelity Bank bearing the name American Finance Management Corp. were found in the attache case.

The affidavit submitted in support of the search warrant sets forth the information provided by Mr. Weiss, the information provided by Mr. Hickey, the information obtained by the FBI agents from the National Crime Information Center and from their surveillance, and the information provided by Carney. It made no reference to the identification of Carney by Miss Bryson.

### Conclusions of Law

Defendants Carney and Mahon seek to suppress evidence which falls into four categories: (1) the oral statements made by Mr. Carney in the FBI office;[1] (2) the contents of the attache case Mr. Carney was carrying when arrested; (3) a checkwriting machine found in the Oldsmobile; and (4) the identification of Mr. Carney by Miss Bryson at the FBI office.[2] Each of these categories will be considered separately.

### I. Mr. Carney's Oral Statements

■ Whether evidence relating to or derived from Mr. Carney's statements to the FBI should be suppressed depends on A) whether this arrest was legal;

B) whether he was advised of his right to remain silent and his right to counsel, and thereafter made an intelligent waiver of those rights,[3] C) whether he was taken before a committing magistrate without unnecessary delay.

### A. The Arrests

Mr. Carney's arrest, while without a warrant, was legal. Agents of the FBI "may * * * make arrests without warrant * * * for any felony cognizable under the laws of the United States if they have reasonable grounds to believe that the person to be arrested has committed or is committing such felony." 18 U.S.C. § 3052. United States v. La Macchio, 362 F.2d 383 (3rd Cir. 1966). "Any offense punishable by death or imprisonment for a term exceeding one year is a felony." 18 U.S.C. § 1. Mr. Carney and Miss Sturm were arrested for interstate transportation of a stolen motor vehicle, an offense which is punishable by imprisonment for a term up to five years. 18 U.S.C. § 2312.

■ The "reasonable ground" requirement of Section 3052 is equivalent to the "probable cause" requirement of the Fourth Amendment. Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); United States v. La Macchio, supra. Probable cause exists where the facts and circumstances within the knowledge of the arresting of-

---

1. Defendant Mahon's motion asked suppression of any oral statements made by him. The testimony did not, however, establish that he had made any inculpatory statements, and the prosecuting attorney has represented to the Court that the government will not offer any testimony of statements of this character by Mr. Mahon. This portion of his motion, is, accordingly, moot.

2. Other tangible evidence was seized in the course of the searches which the government might attempt to utilize at trial. A decision with respect to the four categories listed here, however, will determine all issues raised by the defendants.

3. The government has not relied on the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 3501, and, since I find that the evidence here sought to be suppressed is admissible under the more restrictive law which theretofore existed, I have not analyzed this matter in this opinion along the lines set forth in that statute. I have, however, considered the five factors listed in subsection (b) of Section 3501 and have concluded that the statements of Mr. Carney were voluntary and, accordingly, admissible under subsection (a) of that Section. As appears from the findings of fact, the delay in taking these defendants before the magistrate was substantially less than the six hour period specified in subsection (c) of Section 3501.

ficers, and of which they had reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in believing that an offense has been or is being committed and that the person to be arrested was or is the offender. Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925); Henry v. United States, 361 U.S. 98, 102, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); United States v. La Macchio, *supra*, 362 F.2d at 384–385; United States v. Thompson, 292 F.Supp. 757, 761 (D. Del. 1968). Evidence required to establish guilt is not necessary. Henry v. United States, *supra;* United States v. Thompson, *supra.*

▮ Here there was "probable cause" as so defined. At the moment of Mr. Carney's arrest, Agents Snyder and Lundgren had information from reliable sources that (1) the Mercury was a car recently stolen in Pennsylvania, (2) that two people fitting the description of Mr. Carney and Miss Sturm used the car on the previous day at the bank, and (3) that the occupants of Room 147 had arrived at the motel with this car on the prior evening. Upon their arrival at the motel they had observed the Mercury parked immediately adjacent to Room 147 and had thereafter seen Mr. Carney emerge from that room, take keys, and unlock the car, apparently preparing to drive away in it.

*B. Advice, Understanding and Waiver of Constitutional Rights*

▮ On two separate occasions before he made a statement, Mr. Carney was warned of his rights as required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The warnings included not only the fact that he might remain silent, but also an admonition that any statement he might make could be used as evidence against

him. Despite these two warnings, the defense now urges that Mr. Carney's statement should be suppressed. While he agreed to make an oral statement to Agent Snyder and thus appeared to waive his right to remain silent, Mr. Carney claims that he did not make an *intelligent* waiver as required by *Miranda* since he did not comprehend that an oral statement as well as a written one could be used against him. This lack of understanding, which Mr. Carney testified to at the hearing, is alleged to have additional support from the undisputed fact that Mr. Carney read but refused to sign a waiver of rights form.

Mr. Carney is a man of mature years; I would say he is in his late twenties or early thirties. His formal education included the ninth grade of high school. His testimony demonstrated that he is of above average intelligence, quick of thought, articulate, composed under pressure and not easily intimidated. His letters to the Court in support of various motions in this case confirm the conviction I have from his testimony about these matters.

It is conceded that the *Miranda* warnings were given twice. There can be no doubt that Mr. Carney had the capacity to understand what was said to him in clear and simple terms and what he read for himself. Nor can there by any doubt that his mind was composed and functioning when he received this information. This is demonstrated not only by his affirmative response to Agent Snyder's question as to whether he understood his rights, but also by his attempt to establish a prior legitimate connection with the FBI. It is likewise evidenced by his own testimony that he strenuously protested that his attache case had been searched in violation of his constitutional rights.[4]

---

4. In a letter to the Court, received immediately prior to the issuance of this opinion, Mr. Carney asserted that he was under the influence of drugs at the time of his arrest. He did not so testify at

either of the two hearings held in this matter and there is no evidence in the record to support this claim. Agent Snyder was asked whether Mr. Carney appeared to be under the influence of some kind

In short, I do not believe Mr. Carney's assertion at the hearing that he thought only written and not oral statements could be used against him. The Court's observation in Pettyjohn v. United States, 136 U.S.App.D.C. 69, 73, 419 F.2d 651, 655 (1969) accurately reflects my conclusion based upon the testimony in this case:

> In reality, after an objective analysis of all the factors and cirmumstances involved in [the defendant's] waiver, his position is really reduced not to a claim that he did not understand what he was doing but that what he did was, in retrospect, an unwise thing for him to do. A [suppression] based upon such a claim would be equally unwise.

Mr. Carney's refusal to execute a waiver of rights form is not inconsistent with this conclusion. United States v. Ruth, 394 F.2d 134 (3rd Cir. 1968); United States v. Stuckey, 441 F.2d 1104 (3rd Cir. 1971).

I reach a similar conclusion with respect to Mr. Carney's claim that he unsuccessfully requested counsel twelve times prior to and during the making of his statement. Agent Snyder testified that no such request was made prior to arrival at the magistrates' office and that, in accordance with his unvarying practice, he would have immediately terminated the interview if such a request had been made. Agent Snyder's testimony about his procedure in situations like this convinced me not only that he fully understands the constitutional rights of those accused of crime but also that he takes his responsibility of observing those rights with appropriate gravity. His handling of the attache case at the scene of the arrest bears strong witness to these facts. I simply do not believe that a law enforcement officer with Agent Snyder's knowledge and experience, who already had as much

incriminating evidence against Mr. Carney as Agent Snyder had at the time and was reasonably certain to get in short order with a valid search warrant, would jeopardize his case by ignoring twelve demands for counsel and permitting Mr. Carney's oral statement to be used in the application for a search warrant.

Conversely, I am convinced that if a man of Mr. Carney's capabilities and temperament had felt as strongly about representation as twelve demands for counsel would indicate, he would not have proceeded, in the absence of counsel, to answer cooperatively all the questions put to him. In the absence of some evidence of prolonged detention prior to the making of the oral statements, extended interrogation, or some other evidence of direct or indirect coercion, none of which is or could be asserted here, the facts of record are susceptible of explanation only on the theory that Mr. Carney voluntarily decided to give his story without counsel. I am convinced that this is what, in fact, happened.

### C. The Length of Detention

Rule 5(a) of the Federal Rules of Criminal Procedure requires that "any person making an arrest . . . without a warrant shall take the arrested person without unnecessary delay before the nearest available commissioner or before any other nearby officer empowered to commit persons charged with offenses against the laws of the United States." What constitutes "unnecessary delay" must be determined in light of all the facts and circumstances of the case. Heideman v. United States, 104 U.S.App.D.C. 128, 259 F.2d 943, 945 (1958); Muschette v. United States, 116 U.S.App.D.C. 239, 322 F.2d 989, 991 (1963); United States v. Taylor, 374 F.2d 753, 757 (7th Cir. 1967); United States v.

---

of drug or whether there was anything unusual about his speech, his eyes or his physical movements, and he responded in the negative. In any event, based

on the above recited facts, I conclude that even if Mr. Carney had taken a drug, he was in full control of his faculties and understood what was going on.

956

Hamilton, 409 F.2d 404, 406 (7th Cir. 1969).

 In this case, the arrest was made at 12:20 p. m. and Mr. Carney appeared before the magistrate at 5:06 p. m. His interview with Agent Snyder was concluded, however, at 2:55 p. m. Since detention for an unreasonable length of time after a statement will not retroactively vitiate an otherwise valid confession, United States v. Mitchell, 322 U.S. 65, 70–71, 64 S.Ct. 896, 88 L.Ed. 1140 (1944); Pettyjohn v. United States, 136 U.S.App.D.C. 69, 419 F.2d 651, 656 (1969), the relevant question is whether Mr. Carney's detention from 12:20 p. m. to 2:55 p. m. was unreasonable. This period may be broken down for purposes of discussion into two intervals: the time between the arrest and arrival at the FBI office (12:20 p. m. to 1:15 p. m.) and the period of detention at the FBI office prior to the termination of the interview (1:15 p. m. to 2:55 p. m.).

After the arrest at 12:20 p. m., there took place a body search of the defendants, an advice of rights, a preservation of possible evidence (e. g., the attache case), a scuffle with and a "fit" by Miss Sturm, a call for an ambulance for her, a wait for the ambulance, a wait for the FBI's own transportation to be brought by Agent Leonard and a trip from Newark to Wilmington, a distance of approximately 12 miles. The local office of the FBI, as well as the office of the Federal Commissioner, are located in the Federal Building in Wilmington and the FBI agents were clearly entitled to bring the defendants back to their office in order to "process" or "book" them and make the necessary administrative arrangements before taking them before the Commissioner. Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957); Heideman v. United States, 104 U.S.App.D.C. 128, 259 F.2d 943 (1958). Accordingly, I find no unreasonable delay prior to 1:15 p. m.

Similarly, the processing of Mr. Carney between 1:15 and 1:30 was permissible and the detention required therefor was not of unreasonable duration. With respect to the period from 1:30 p. m. to 2:50 p. m., I should say initially that I am convinced the defendants were neither taken to nor detained at the FBI office for the purpose of extracting inculpatory statements from them. I am also convinced that no attempt was made at the FBI office to coerce such statements. This, however, does not end the matter. Under the principles announced in the Mallory case, the procedure adopted by the law enforcement officers must not give an unnecessary *opportunity* for the extraction of a confession.

Agent Snyder finished processing Mr. Carney at 1:30 p. m. It was Saturday. At that time, no Federal Commissioner was available and arrangements had to be made to take the defendants before a local magistrate. Moreover, the FBI had three other persons [5] under arrest whom they had to process and for whom they had to prepare papers. Under these circumstances I can not conclude that there had been an unreasonable or unnecessary delay when Agent Snyder asked Mr. Carney about the events giving rise to the charge against him.

 At the outset, Mr. Carney volunteered information about a relationship with the FBI which he represented would provide an explanation for what Agent Snyder had observed. What Mr. Carney said could conceivably have led to an explanation consistent with his innocence. Agent Snyder had a duty to check this information out and he did. United States v. Chadwick, 415 F.2d 167 (10th Cir. 1969). This took some time. When the information did not check out, Agent Snyder so informed Mr. Carney. This also was not improper; he may have had a further explanation of Agent Wood's relayed response. United States v. Chad-

5. While the record does not disclose when and how defendant Blandford was arrested, it does indicate he was in the FBI office for processing.

wick, *supra*. Upon being informed of this response, Mr. Carney voluntarily told, among others, the story now sought to be suppressed and Agent Snyder took the time to listen. This likewise was permissible. Officers are not required "to refuse to permit * * * [an] arrested person to continue his statement for the purpose of rushing him before a committing magistrate." *See* Walton v. United States, 334 F.2d 343 (10th Cir. 1964) and the cases cited therein.

This was not a case where an arrested person was asked about the evidence against him at a time when he could · have been taken before a commissioner or magistrate. But even if all the processing and administrative work for the four defendants had been completed in 15 minutes and a magistrate had been waiting, Mr. Carney's statements would still be admissible. Chief Justice Burger, when he was a Circuit Judge, announced the following standard of conduct for law enforcement officers in Heideman v. United States, 104 U.S.App. D.C. 128, 130–131, 259 F.2d 943, 945–946 (1958):

> At the outset, the police, assuming they have probable cause for arrest, are entitled to ask the arrested suspect what he knows about a crime. If he denies knowledge, they are entitled to state to him what evidence they have and ask whether he cares to comment upon it. A strong circumstantial case which would satisfy the U.S. Commissioner, prima facie, might well be explained away by a suspect who knew what information the police relied on— hence leading to no charge being made. If the suspect continues to deny knowledge, the police are entitled to conclude the interview by saying, in effect, "Do you have anything further to tell us, or do you just want to let it stand the way it is?" * * * Such questions as these the police may ask—indeed *should* ask; it is only when the questioning crosses into what can be termed "grilling," or is continued beyond the brief period allowed, that the

resulting confession may be held inadmissible.

I subscribe to this view. See also, United States v. Chadwick, 415 F.2d 167 (10th Cir. 1969).

## II. The Attache Case

■ It is undisputed that the attache case was searched on Sunday pursuant to a search warrant issued by the United States Commissioner. The validity of this search depends, of course, upon whether there was probable cause for the issuance of the warrant. The Third Circuit Court of Appeals in United States v. Scolnick, 392 F.2d 320, 323–324 (3rd Cir. 1968), defined "probable cause" for this purpose as follows:

> The "probable cause" required for the issuance of a search warrant, as the very term implies, involves probabilities. Probable cause exists where "the facts and circumstances within [the officers] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" a search should be conducted. Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925).

The affidavit submitted by the FBI in support of its application for a search warrant meets this standard. The defendants do not deny that the information contained in the affidavit would be sufficient if it had been based upon the personal knowledge of the affiant or if it had been information related to the affiant by one who had observed the incidents reported. They point out, however, that some of the information set forth is "double hearsay" and argue that this impairs the validity of the search warrant, citing Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1967) and United States v. Roth, 391 F.2d 507 (7th Cir. 1967). In particular, defendants rely on the following statement of the court in the Roth case:

> We believe that an affidavit containing "inherently defective hearsay on

hearsay" (that is, hearsay on hearsay as to which there is absent any indication of the reliability of the anonymous hearsay source) can withstand attack only if the supporting circumstances related therein are sufficient in themselves to establish probable cause.

Defendants assert, for example, that the information provided by Mr. Weiss falls within this category, pointing in particular to the fact that the affidavit indicates that Weiss "had determined" what the license number of the motor vehicle was. The testimony elicited at the hearing, defendants assert, establishes that Weiss himself had no personal knowledge of the information that he conveyed to the affiant.

The *Spinelli* and *Roth* cases dealt with situations where a confidential informer had relayed information to an agent. The courts were concerned about the possibility that the information was based on nothing more "substantial than a casual rumor circulating in the underworld or accusation based merely on an individual's general reputation". Spinelli v. United States, *supra*, 393 U.S. at p. 416, 89 S.Ct. at p. 589. Neither condemns "double hearsay" in a context where the information in the affidavit vouched for the reliability of such information.

In the instant case, with the possible exception of the license number, the original source of the "double hearsay" is specified and vouches for its reliability. A good example is the double hearsay information with respect to the fact that the checks were stolen. The affidavit recites that Mr. Weiss informed Agent Lundgren that "he had determined from officers of the American Finance Management Corporation, Upper Darby, Pennsylvania that both checks * * * were stolen along with several other checks in a burglary of that firm on October 29, 1970." This is clearly sufficient.

As to the license number, I think it a fair inference when the security officer of the bank states that "he had determined" that the depositor of a check was driving a car with a particular license plate, that he has either observed it himself or that it has been ascertained by someone under his supervision.[6] I think this would be sufficient indication of the reliability of the information. I need not rest my holding solely on that proposition, however, because the *Spinelli* case clearly indicate in its discussion of Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), that the specificity and detail of information which may be double hearsay may itself vouch for the reliability of the information, at least where, as here, it is confirmed by that which the law enforcement officers later observe. It would be difficult to conceive of information more specific and detailed than the license number of a motor vehicle.

In short, I conclude that there is sufficient indication in the affidavit of the reliability of all of the "double hearsay" contained therein.

This does not end the matter of the attache case, however. Mr. Carney strenuously asserts that there was an illegal search of his attache case, without a warrant, at the time of his arrest. Again, I am confronted with a conflict of testimony. Agent Snyder testified that he took the briefcase and immediately placed it on the hood of the car, that he cautioned those present initially and those who thereafter arrived not to touch it, that he took it with him back to the FBI headquarters and that it was under lock and key until it was searched for the first time on Sunday. While defense counsel developed the point that Agent Snyder's attention was undoubtedly diverted from the case during his scuffle with Miss Sturm and her subsequent "fit," I do not consider this sig-

---

6. As indicated in the statement of facts, it appeared at the hearing that the license number had been determined by a teller who had been sent out of the bank for this purpose.

nificant since Mr. Carney's testimony, which was the only evidence in the record of a search prior to Sunday, was that the case had been opened by the agent who put the case on the hood at the time he put it there.[7] Agent Snyder's distraction occurred subsequently.

I believe Agent Snyder's testimony. I disbelieve Mr. Carney's testimony not only because it conflicts in a number of respects, both major and minor, with that of Agent Snyder, but also because Mr. Carney was unable upon arrival at the FBI office to supply even a géneral description of the agent who he claims had opened the case.

Finally, for the reasons hereinafter discussed in connection with the check writing machine, I conclude that the search on Sunday pursuant to a valid search warrant would not be rendered invalid even if an agent had looked in the case on Saturday.

### III. The Check Writing Machine

█ With respect to the checkwriting machine, suppression is urged on the basis of Mr. Mahon's testimony that when he was arrested, he was replaced or joined in the blue Oldsmobile by an officer who, acting without a warrant, lifted the clothes, searched the cardboard box, and discovered the checkwriter. The government did not call the arresting agent and introduced no other competent evidence to rebut this testimony. In addition, Mr. Mahon's testimony regarding these events was less than clear. In particular, it was ambiguous as to whether Mr. Mahon was in the car when the alleged search occurred or whether he had previously been removed. It is possible that a search of the cardboard box at this juncture might have been justifiable as a search incident to a lawful arrest. However, on this record, I prefer not to decide whether, in fact, a search occurred and, if so, whether it was a valid one. A decision on these questions is not neces-

sary. For even if both these issues were resolved in the defendants' favor, their claim would yet fail. The FBI reached the same checkwriter on Sunday by means of a search warrant, which I have held to be valid, and the prior glimpse, if there was one, did not taint this subsequent search and seizure.

When the Supreme Court first announced the "fruit of the poisonous tree" doctrine in Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920), the articulation of that doctrine contained a qualification frequently referred to as the "independent source" rule. Justice Holmes there wrote:

> The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the court but that it shall not be used at all. Of course this does not mean that the facts thus obtained become secret and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others, but the knowledge gained by the Government's own wrong cannot be used by it in the way proposed. 251 U.S. at 392, 40 S.Ct. at 183 (1920).

Forty-three years later, in Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), Justice Brennan, writing for the Court, restated the independent source rule as follows:

> We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality the evidence to which instant objection is made has been come at by the exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." 371 U.S. at 487–488, 83 S.Ct. at 417.

---

7. This was Mr. Carney's original account of the event. Later, he gave a somewhat different account, but neither account was consistent with his counsel's "distraction" theory.

This is a case for application of the independent source rule. The check-writing machine was "come at" by means of a search warrant supported by an affidavit of Agent Lundgren. That affidavit contains no reference to anything observed in the Oldsmobile at the time of Mr. Mahon's arrest. No information contained in the affidavit has been shown to have been acquired as a result of any inspection which may have been made at that time. Indeed, the record affirmatively establishes that all of the information contained in the affidavit was secured from wholly independent sources specified therein (i. e., Mr. Weiss, Mr. Hickey, the National Crime Information Center, the FBI surveillance and Mr. Carney).

The "fruit of the poisonous tree" doctrine is designed to deprive law enforcement officers of any gain resulting from an illegal investigative procedure. It is not designed to deprive law enforcement officers of the benefits of information obtained as a result of a legally conducted investigation. The doctrine is, accordingly, not applicable here. Rather, this case is governed by that line of cases in which the government has affirmatively established that, despite the existence of an illegal search, a subsequent search and seizure has been made with a search warrant obtained solely on the basis of information secured from identified legal sources. E. g. United States v. Paroutian, 319 F.2d 661 (2d Cir. 1963) cert. den. 375 U.S. 981, 84 S.Ct. 494, 11 L.Ed. 2d 426 (1964); Parts Manufacturing Corp. v. Lynch, 129 F.2d 841 (2d Cir. 1952), cert. den. 317 U.S. 674, 63 S.Ct. 79, 87 L.Ed. 541 (1942); United States v. Radford, 361 F.2d 777 (4th Cir. 1966).

*IV. The Identification of Mr. Carney*

As indicated in the findings of fact, Mr. Carney was identified in the FBI office by a bank teller as the man who had opened the account in the name of Clinton C. Frank. It appeared that Mr. Carney was alone in a room with Agent Snyder at the time of this identification and that he was not then represented by counsel. The facts surrounding this identification were not fully developed, however, and the teller did not testify. The prosecuting attorney represented that the government would not offer evidence of this identification at trial. Defense counsel promptly asserted that this assurance was insufficient because the pending motions sought to suppress not only this identification but also any evidence "tainted" thereby.

On the present record, I am unable to ascertain what, if any, evidence of the government resulted from or was affected by this identification. Accordingly, I am reserving decision on the defendants' motions insofar as they relate to the suppression of the identification of Mr. Carney at the FBI office and any evidence tainted thereby. If counsel for defendant Carney or defendant Mahon believes that any evidence offered by the government at trial is tainted by this identification, they are free to object and the admissibility of the evidence will be determined at that time. In all other respects, defendants' motions are denied.

Submit order in accordance herewith.