GOVERNMENT OF THE VIRGIN ISLANDS, Plaintiff

v.

JAMES KIRNON, Defendant

Crim. No. 114-1973

Crim. No. 115-1973

District Court of the Virgin Islands

Div. of St. Croix

June 28, 1974

JULIO BRADY, United States Attorney, Christiansted, St. Croix, V.I., *for plaintiff*

EDWARD J. OCEAN, Christiansted, St. Croix, V.I., *for defendant*

YOUNG, *District Judge*

### MEMORANDUM OPINION AND ORDER ON MOTION TO SUPPRESS

This is a motion by defendant to suppress all evidence and statements obtained from him on the ground that they were acquired in violation of his constitutional rights. An extensive hearing on the motion was conducted on December 12 and 13, 1973. As certain novel legal questions were raised at the initial arguments on December 13, a full transcript of the proceeding was ordered and counsel for defendant and government were directed to file memoranda of law. Although the transcript was completed on

January 25, 1974, additional delay resulted because defense counsel did not file his brief until May 14, 1974. The Government's memorandum was submitted on June 10, 1974 and was followed on June 11 with a motion to reopen the suppression hearing for the limited purpose of presenting evidence as to the time of day at which defendant arrived at the detective bureau on October 2, 1973. The motion to reopen was argued on June 14, 1974 and it was granted by the Court.[1] Thereafter defense counsel moved for a stay of further proceedings pending an appeal of the decision to reopen. This motion was denied by written Order dated June 19, 1974. Final arguments on the motion to suppress took place on June 21, 1974.

## I. PRELIMINARY POINTS RAISED ONLY IN MOTION TO SUPPRESS

Before dealing with defendant's principal contentions with respect to the suppression of his confession, several points raised in the motion to suppress of October 31, 1973, but not pursued in the briefs or arguments, should be considered. The first of these is that defendant was arrested "without an arrest warrant, without authority, and without probable cause."

It is undisputed that the defendant was arrested at about 4 P.M. on October 2, 1973. (Tr. pp. 164–165.) Moreover, there is no question that the arrest took place without a warrant. The only possible issue, then, is whether the arrest was supported by probable cause or, in the language of 5 V.I.C. § 3562, whether Detective Doward had "reasonable cause for believing" that James Kirnon committed the felony under investigation.

---

[1] In so ruling, I noted that no prejudice to defendant Kirnon had been articulated by defense counsel and in the interest of justice I felt that I should exercise my discretion to reopen the hearing. See, Cranston v. Baltimore & Ohio Ry. Co., 258 F.2d 630 (3d Cir. 1958).

 Although on at least one prior occasion this Court has afforded a defendant what amounted to a preliminary hearing on probable cause for his warrantless arrest, there are strong arguments against engaging in such an inquiry at this stage of the proceedings. The Revised Organic Act § 25 and Federal Rule of Criminal Procedure 54(a)(1) authorize the prosecution by Information of all offenses before the District Court of the Virgin Islands. See Government v. Rijos, 285 F.Supp. 126 (D.C.V.I. 1968) (procedure authorized is constitutional). In effect, the Information takes the place of a grand jury indictment, which is not required. Rivera v. Government, 375 F.2d 988 (3d Cir. 1967). Since the very fact that an indictment is returned makes a preliminary hearing unnecessary, United States v. Heap, 345 F.2d 170 (2d Cir. 1965); United States ex rel. Bogish v. Tees, 211 F.2d 69 (3d Cir. 1954), it would seem that the Information, which replaces the indictment, should have the same effect. While it is true that the Information represents the judgment of the United States Attorney, rather than of a disinterested grand jury, that probable cause exists, this distinction should not lead to the conclusion that an additional determination of probable cause by the Court at a preliminary hearing is required. State v. Hayes, 18 A.2d 895, 914 (Conn. 1941). "The function of determining that probable cause exists for the arrest of a person accused is only quasi-judicial, and not such that, because of its nature, it must necessarily be confided to a strictly judicial officer or tribunal." Ocampo v. United States, 234 U.S. 91, 100 (1914). Therefore, because an Information has been filed it is unnecessary for me to determine whether the arrest of James Kirnon on October 2, 1973 was supported by probable cause. However, because the question is one of

first impression in this jurisdiction I will hold, alternatively, that the confession given by the defendant to Detective Doward shortly before his arrest (Tr. pp. 160–161) constituted reasonable cause for believing that James Kirnon committed the offense.

 The second group of objections mentioned in the initial motion to suppress but not briefed or argued thereafter involve the search warrant issued on October 2, 1973, by Judge William Moorhead. Defendant argues that the warrant is insufficient because it does not name the victims of the crime. (October 31st Motion, Para. 5, Tr. pp. 7–8.) No such requirement is stated in the 4th Amendment or Federal Rule of Criminal Procedure 41(c) and the omission is therefore immaterial. In any event, the affidavit of Detective Doward did reveal the victims' names rendering impossible any conceivable confusion about which October 1st murder was involved.

Defendant further stated that the affidavit and the search warrant were "insufficient" without clarifying the nature of the insufficiency. I have examined the warrant (Defendant's Exhibit A) and find that it describes with particularity both the place (by apartment and building number) to be searched and the things to be seized in a manner which enabled the officers to locate them definitely, with certainty, Steale v. United States, 267 U.S. 498 (1925), and without the exercise of discretion. Marron v. United States, 275 U.S. 192 (1927). Similarly, the affidavit of Detective Doward on the basis of which Judge Moorhead issued the warrant appears quite sufficient. It sets forth the facts revealed by the confession which establish probable cause for believing that the offense was committed and that relevant evidence would be discovered at the location described. Dumbra v. United States, 268 U.S. 435 (1925). The place to be searched is described as well

as the property to be seized. Trupiano v. United States, 334 U.S. 699 (1948). Finally, as the affidavit reveals that the apartment was the defendant's own residence, the person having possession or control of the property was adequately set forth. See Crossland v. State, 266 P.2d 649 (Okla. Crim. 1954).

The last preliminary objection of the defendant is that the search exceeded the bounds described in the search warrant. (October 31st Motion, Para. 6.) I find no evidence of such a departure from the directions of the warrant. I find that the search was reasonable, authorized by a valid search warrant supported by a proper affidavit, and satisfied the requirements of the 4th Amendment. Therefore, the physical evidence seized as a result of the search will not be suppressed on the basis of defendant's arguments raised in paragraphs 4–7 of his motion to suppress.

## II. COERCION

Defendant's October 31st motion to suppress charges that any written or oral statements he made were "not made voluntarily" (Para. 1(c)) and were taken "when defendant was undergoing great mental strain and physical pain inflicted by investigating officers" (Para. 1(b)). Defendant's memorandum repeats this allegation under point No. III: "The confession is inadmissible because it was not voluntary but coerced through violence and threats." If defendant is correct and the detectives to whom he confessed did resort to brutality or threats of brutality, then his confession was involuntary and must be suppressed. Sims v. Georgia, 389 U.S. 404 (1967); Stein v. New York, 346 U.S. 156 (1953). This section, then, will examine the testimony of the defendant and others in an effort to determine whether physical violence, threats of

violence or other psychologically coercive tactics[2] were utilized in order to obtain a confession.

 The only testimony suggesting that the incriminating statements given to the detectives in the case were coerced or involuntary came from the mouth of the defendant himself. His interest in so testifying is obvious and his motive for presenting evidence of brutality is a factor which the Court must consider in evaluating his credibility. But I cannot let this circumstance weigh too heavily in my consideration of his testimony. Rarely does a defendant have the benefit of a "friendly or disinterested witness" to the acts of brutality he alleges occurred. Culombe v. Connecticut, 367 U.S. 568, 574 (1961). Therefore his testimony must be given careful scrutiny. If it displays enough indicia of reliability, if it appears to the fact-finder to be probably or even possibly trustworthy, the defendant's testimony is entitled to great weight, despite the absence of corroboration by impartial observers.[3] With these considerations in mind, I will examine James Kirnon's account of his encounter with police detectives on October 2, 1973, for evidence of brutality.

Mr. Kirnon stated that after he arrived at the detective bureau, Detectives Jorge Torres and Gerard Doward beat him with an iron pipe, two and a half feet long, (Tr. p. 87) with their fists (Tr. 88, 89, 99), struck him in the genital region (Tr. p. 90) and made him chew a cigarette. He also

---

[2] Ashcraft v. Tennessee, 322 U.S. 43 (1944). The presence of psychological coercion is as significant as the use of physical violence. The Supreme Court has long recognized that "the blood of the accused is not the only hallmark of an unconstitutional inquisition." Blackburn v. Alabama, 361 U.S. 199, 206 (1960); Miranda v. Arizona, 384 U.S. 436, 448 (1966). My examination of the entire atmosphere of the defendant's questioning by the police will be divided between this section and the following subdivision, with more emphasis on physical brutality in the former.

[3] By setting forth some of the factors which I consider relevant in assessing the credibility of a defendant testifying as to police brutality, I am not suggesting that the defendant bears any burden of proof on this issue. Once any evidence of brutality or threats, no matter how slight, comes into the case the government has a heavy burden to rebut it and prove that any statements made were entirely voluntary.

testified that they threatened to burn his eyes (Tr. p. 89), to hang him (Tr. pp. 90–91) and to shoot him (Tr. p. 91). After this last threat, Kirnon stated: "I say, okay, okay, okay," and made his confession.

In addition to defendant's testimony, the Court permitted Joseph Dyer, the husband of defendant's aunt, to testify about his experiences with police brutality on the theory that such evidence might tend to show the disposition of the detectives to use force in going about their investigation of the crime. Mr. Dyer testified that around 8 P.M. on October 2, 1973, Detectives McBean and Jorge Torres picked him up. Thereafter Detectives Torres and Perrera together beat him in the stomach and back. (Tr. pp. 35, 41). According to Dyer his torture lasted for several hours. (Tr. p. 41). After this alleged beating, he was free to go home and did go home, but was requested to return to the detective bureau the next morning. And he did return to the detective bureau, voluntarily and promptly. Shortly after his return, he complained of illness and was taken to the hospital by Detective Jackson (Tr. p. 39), at the request of Detective Torres. (Tr. p. 39).

Before examining the evidence introduced by the Government to rebut these allegations of brutality, it is important to examine the statements themselves to determine if they are probable or consistent with human experience. First, one is immediately impressed with the magnitude and duration of the violence allegedly utilized. It seems unlikely that the detectives would resort to such force at the detective bureau, a small building consisting of three rooms occupied at the time by three secretaries, Chief Anne Schrader, Walter Julio (a juvenile officer) and several other detectives. (Tr. pp. 150–155.) Surely, even a heavy-handed law enforcement officer would be more careful and attempt to conceal such outrageous conduct. But here, the door to the room where the beatings allegedly took place

476

was open (Tr. p. 89) so that everyone present would have heard Kirnon's crying (Tr. p. 88) and screaming. Because defendant's version of the events of October 2nd is so implausible, I have grave doubts about its truthfulness, even before considering the rebuttal evidence of the government.

In response to the defendant's testimony, the government developed several categories of important evidence tending to demonstrate that no violence or threat of violence was employed against James Kirnon on October 2nd. When taken together this evidence, especially in light of defendant's unbelievably implausible story, convinces me that no force or threat of force was utilized.

The first significant category of testimony is that which indicates that James Kirnon, from the moment he met the detectives at his aunt's home, was cooperating with them. Detective Eleuterio Torres testified that Kirnon was willing to go to the station with them (Tr. p. 139) and accompanied them voluntarily. After the brutal beating allegedly took place, Kirnon continued to cooperate and was willing to take the police to the scene of the crime. (Tr. p. 164–165). Later that day, Dr. Diaz, a neutral observer, stated that Kirnon was "calm and cooperative." (Tr. p. 23.) There would have been no reason for the detectives to resort to violence when defendant was cooperating with them and voluntarily did everything which was required for the investigation.

The second important piece of evidence is the flat denial by Detective Doward, to whom the incriminating statement was given, that he beat the defendant. (Tr. pp. 174, 197.) Such a denial is clearly entitled to some consideration, along with the other evidence, in determining whether the defendant's version of the day's events is credible.

The third factor which I view as quite important is that defendant never complained to Judge Moorhead, who

advised him of his rights, that he was the victim of brutality. (Tr. p. 125.) Certainly, the atmosphere of the courtroom and the occasion of an advisement of rights would provide an ideal setting for a defendant to relate any police misconduct, if it had occurred.

Finally, and most significant, is Dr. Diaz' failure to find any subjective or objective signs that Kirnon had been brutalized. (Tr. p. 20–22.) The examination took place only hours after the alleged beatings and certainly would have uncovered some indication of the recent violence if there had been any—especially that of the alleged blows to the neck with a heavy iron pipe.

Because of these numerous circumstances rendering Mr. Kirnon's testimony incredible, I will not dwell at length on the testimony of Joseph Dyer, which is at best only tangentially relevant. I note that Dyer's trip to the hospital on Monday was made at the direction of Detective Torres, who was the one who allegedly beat Dyer the night before. It is unlikely that a detective who had administered a beating would be anxious to develop objective evidence of it by sending the victim to the doctor. Furthermore, it is significant that Detective Jackson, who accompanied Dyer to the hospital, saw no physical signs of injury. (Tr. p. 217.) Finally, I find in the record a plausible explanation for Mr. Dyer's ill health on the morning of October 3, 1973. He had apparently sustained a serious head injury in connection with his employment and, as recently as the Monday before this investigation, had been under a doctor's care. (Tr. p. 44.) Therefore, I do not think his testimony can in any way overcome the infirmities in Mr. Kirnon's story or render it more believable. I find as a fact that no force or threats of force were directed at Mr. Kirnon on October 2, 1973, in connection with the investigation of the crime in question.

In concluding that the government met its heavy burden of demonstrating that no coercion was utilized, I am not unmindful of the fact that several potentially relevant witnesses who could have been called by the government were not asked to testify. Defendant cites the recent Mississippi case of Nabors v. State, 15 Cr. L. Rep. 2169 (Miss. 4/15/74) for the proposition that all officers accused of participating in the brutality must be called. Although as a matter of prosecutorial practice, I think it would be wiser to call all the detectives who may have been involved, I do not think that, where their testimony would be merely cumulative and the defendant's version has already been rendered so unbelievable, the failure to call certain potentially useful witnesses compels the conclusion that the government has failed to meet its heavy burden. In this regard, I note that in the case of Smith v. State, 15 Cr. L. Rep. 2018 (Ark. 2/25/74), also cited by defendant for the proposition that all material witnesses must be called, a doctor testified that six days after the alleged beating the defendant had a ruptured eardrum which could have been caused by a blow to his head. This evidence corroborating the defendant's version made it incumbent upon the government to explain the injury, through every possible witness. Here, however, a doctor testified that hours after the beating, no signs were observed. Little purpose would have been served by marshalling further oral testimony of police officers when the government, through other witnesses, had already conclusively rebutted defendant's testimony.

### III. QUESTIONING OF DEFENDANT: REQUIREMENT OF PROBABLE CAUSE AND COMPLIANCE WITH MIRANDA v. ARIZONA

The principal contention of defendant in support of his motion to suppress is that his questioning by police on

October 2, 1973, was illegal and that any confession which resulted was acquired in violation of Miranda v. Arizona, 384 U.S. 436 (1966). Defense counsel argues that these two concepts must be considered together and that they necessitate suppression of any statements made by Mr. Kirnon on October 2nd. (Tr. p. 230.)

Briefly stated defendant argues that police investigators must have probable cause to question anyone about a crime. (Tr. pp. 220–222.) If probable cause for questioning exists, the police are limited in their questioning to exploring those circumstances which gave rise to probable cause. (Tr. p. 222.) If questioning takes place at police headquarters or if the person is not interviewed at his home, defendant argues that custodial interrogation is taking place and must be preceded by Miranda warnings. (Tr. p. 224.)

Defense counsel then applies these principles to the facts of this case and argues that defendant's confession must be suppressed. James Kirnon was approached by the police for an interview because he had been a suspect in a previous rape case. (Tr. p. 134.) It is argued that this circumstance does not constitute "probable cause" for questioning, and even if it does, the questioning had to be limited to the facts of the prior offense. Defendant was not questioned at his home at Bassin Triangle but rather was driven to the detective bureau by the police. (Tr. pp. 140, 149.) From these facts, defense counsel argues that custodial interrogation began when Mr. Kirnon left his home and the failure to advise him of his rights at that time necessitates suppression of the confession. (Tr. p. 224.)

## A. Probable Cause for Questioning

Several interesting and difficult questions are presented by defendant's argument that police cannot question an

individual during the investigation of a crime without probable cause. The argument begins with the statement in Terry v. Ohio, 392 U.S. 1, 16 (1968) that "whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." The Court's approval of a limited stop and frisk for weapons on less than probable cause for arrest is taken by defendant as a disapproval of any other "intrusions short of an arrest" on less than probable cause. 392 U.S. at 26, 27. Among such "intrusions," he argues, is the questioning by police during an investigation of someone who may have information about the crime.

■ Clearly, defendant's argument goes too far. Police investigation would be totally ineffective if no questions could ever be asked of anyone unless probable cause was first established. In effect, the process of investigation would be turned on its head, requiring the police to develop information and facts about the crime and possible participants before they pursued their first lead. Obviously, at the very minimum police must be permitted to question persons who are willing to be interviewed. Nor should police have to wait until they are approached by persons with relevant information. The limited intrusion on a person's privacy which occurs when a police officer asks if he will answer a few questions is certainly reasonable and not proscribed by the 4th or 5th Amendment.

Each of the cases cited by defendant is entirely consistent with these conclusions. Davis v. Mississippi, 394 U.S. 721 (1969) involved *detention* by the police for the purpose of obtaining fingerprints. The state in that case made "no claim that petitioner voluntarily accompanied the police officers to headquarters." 394 U.S. at 726. The court did reject the notion that the 4th Amendment applies only at the accusatory stage and not at the investigatory stage of a police exercise. But there is no suggestion in the case

481

that voluntary questioning at the investigatory stage violates the 4th Amendment. Indeed the Court went so far as to state that, under narrowly defined circumstances, it might be permissible for police to require someone to submit to fingerprinting although no "probable cause in the traditional sense" was present. 394 U.S. at 727. Surely the case provides no support for defendant's broad contentions.

Similarly, Morales v. New York, 396 U.S. 102 (1969) fails to establish the requirement of probable cause for voluntary questioning. There, the issue presented was whether someone may be *detained* for custodial interrogation on less than probable cause for a traditional arrest. The Court specifically declined to rule on the question because the record did not permit a "satisfactory evaluation of the facts surrounding the apprehension and detention of Morales." 396 U.S. at 105. Significantly, the court noted that a full evidentiary hearing might reveal that "Morales' confrontation with the police was voluntarily undertaken by him," 396 U.S. at 105, suggesting that such a voluntary submission to interrogation would not violate the defendant's constitutional rights.

Defendant's reliance on Cupp v. Murphy, 412 U.S. 291 (1973) is also misplaced. Referring to Justice Marshall's concurring opinion, defense counsel argues in his brief that the *Court* stated "the police . . . cannot do more than investigate the circumstances that occasion the detention." 412 U.S. at 299. Even assuming that the Court had made the statement, it is clear that it refers to *detentions* absent formal arrest. Indeed, far from announcing a new restrictive rule barring voluntary questioning without probable cause, the Cupp Court was approving a new exception to the warrant requirement by permitting a "very limited search necessary to preserve . . . highly evanescent evidence." 412 U.S. at 296.

A review of the authorities cited by defendant demonstrates that there is no constitutional requirement that police officers have probable cause before approaching someone to ask questions. If answers are volunteered, the questioning need not be limited to the circumstances which led to the encounter. Absent detention or custodial interrogation, the police are free to pursue leads during their investigation of a crime by taking advantage of a cooperative citizenry.[4]

If James Kirnon voluntarily answered questions posed by police detectives prior to custodial interrogation, it is of no consequence that the police lacked probable cause for such questioning. In the initial stage of an investigation no lead, no matter how small, can be overlooked. Mr. Kirnon's involvement in a prior rape case certainly provided sufficient reason for the police to investigate. Their questions need not have been limited to the facts of the previous offense but could permissibly broach the subject of their on-going investigation. However, if the defendant was detained and was not voluntarily answering questions, then the question whether custodial interrogation had begun is presented and compliance with Miranda v. Arizona is mandatory.

### B. Compliance with Miranda v. Arizona

Defense counsel argues that the moment James Kirnon left Bassin Triangle in the company of several police detectives, he was being detained and custody had begun. From the very fact that some questions were answered at the

---

[4] The Court in Miranda v. Arizona, 384 U.S. at 477 recognized these principles: "Our decision is not intended to hamper the traditional function of police officers in investigating crime. . . . General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding." Such an investigation should not have to await the apprehension of a suspect. Indeed, it can, and in this case did, ultimately lead to the discovery of such a suspect.

detective bureau, the defendant would have the court conclude that custodial interrogation had begun.

■ In order to evaluate this contention it is necessary to return to the language of the Miranda Court. The Court stated that "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." 384 U.S. at 444. Thus, questioning while a person is in prison even for an entirely separate offense is custodial interrogation. Mathis v. United States, 391 U.S. 1 (1967). Similarly, questioning which takes place in one's own bedroom can constitute custodial interrogation when police have placed the subject under arrest. Orozco v. Texas, 394 U.S. 324 (1969). Therefore the crucial factor is not where the questioning takes place but whether there is *restraint* of any kind.

■ I have no difficulty, then, in concluding that "custodial interrogation does not necessarily ensue merely because police questioning occurred at a police station." See, e.g., Steigler v. Anderson, No. 73-1720 (3d Cir. 4/18/74); United States v. Schmidt, 471 F.2d 385, 387 (3d Cir. 1972); United States v. Tobin, 429 F.2d 1261 (8th Cir. 1970). Although station house questioning must be closely scrutinized for "any taint of psychological compulsion or intimidation," Steigler, supra, more than official interrogation or even suspicion[5] of the person being questioned must be present. Some affirmative action by the authorities must indicate to the suspect that they would not have heeded a request to depart or have allowed him to do so.[6]

---

[5] The Second Circuit has noted that "almost all official interrogation of persons who later become criminal defendants stems" from suspicion. United States v. Hall, 421 F.2d 540, 544 (2d Cir. 1969).

[6] United States v. Hall, 421 F.2d at 545.

Given these general guidelines, I will examine the facts in this case to determine when custodial interrogation began. I should note first that there has been some dispute about the time at which the detectives arrived at Mr. Kirnon's home to ask if he would answer questions. At the original hearing on December 12 and 13, 1973, Josephine Fenton, defendant's aunt, testified that it was "after 12" or "about lunchtime." (Tr. p. 63.) Her husband, Joseph Dyer, recalled the time as being "between 12 and 1." (Tr. p. 32.) Defendant stated, similarly, that it was "between 12 and 1." (Tr. p. 83.) At the reopened hearing, Detectives McBean and Torres testified, with the aid of a log apparently prepared shortly after the day in question, that they arrived at Bassin Triangle at about 2 P.M.

Although this conflict has involved the Court in some additional proceedings, which proceedings were deemed to be highly prejudicial by defense counsel, I conclude that the exact time that defendant first saw the detectives or arrived at the detective bureau is not critical in determining when custodial interrogation began. On the basis of the testimony of the defendant's witnesses alone, I conclude that the detectives arrived between 12:30 and 1 P.M. Insofar as it is relevant, I will rely on this estimate of the time without considering the testimony of Detectives McBean and Torres given upon the reopening of the suppression hearing.

 The first question confronting me is whether James Kirnon was arrested at his house or was otherwise forced, either physically or by the psychological pressures of a police encounter, to accompany the detectives to the detective bureau. The testimony is uncontradicted that Mr. Kirnon was not arrested until 4 P.M. on the same day. (Tr. pp. 139, 165.) Although Joseph Dyer did testify that he got the "impression" that Kirnon was forced to go with the detectives, Detective Torres was not even certain that

485

Kirnon was ever asked to come with them to the bureau. (Tr. p. 139.) He distinctly recalled that Kirnon "was willing all the time." (Tr. p. 139.) On this evidence, I find as a fact that James Kirnon voluntarily accompanied the detectives to the detective bureau and that, as of 12:30 or 1 P.M. on October 2, he was under no restraint.

The next issue confronting me is whether custodial interrogation began as soon as Kirnon arrived at the bureau, or only after a delay during which general preliminary questioning took place. According to Mr. Kirnon's testimony, he arrived at the detective bureau "around 1 o'clock" (Tr. p. 99), and was not questioned for at least 10 minutes. Therefore I find that questioning began, at the earliest, around 1:10 and probably closer to 1:30. Shortly thereafter (Tr. p. 86), Detective Doward arrived and more detailed questioning began. Still, there was no indication that Kirnon was a likely suspect; the detectives had no reason to restrain him and certainly had no intention of arresting him. Initial questions apparently focused on the circumstances under which Kirnon had suffered a minor eye injury. (Tr. pp. 118, 155.) It was after an explanation about a fight at Times Square Bar that Kirnon became "more nervous" and "jumpy". (Tr. p. 155.)[6a]

That Detective Doward had not focused his attention on Kirnon as a prime suspect who was under restraint in the investigation is suggested by his response to the events which followed. Kirnon completed his explanation of the cut and "at that point he sort of broke down and told us, 'I am going to tell you how it happened.'" (Tr. p. 156.) Not realizing that he was on the verge of receiving a confession to the crimes, Doward "asked him when did this

---

[6a] The explanation for the fresh bruise over Mr. Kirnon's eye—that it was caused by a beer can tossed by some stranger—was itself implausible and gave rise to more directed inquiries from the detectives.

fight occur, and with whom." (Tr. p. 156.) After a pause, Kirnon repeated that he was "going to tell . . . how it happened." This was the first indication that Kirnon knew anything about the incident and, upon recognizing it, Doward immediately called Detective Torres in as a witness and advised Kirnon of his rights. (Tr. p. 157.)

█ From the testimony at the hearing it seems clear that custodial interrogation did not begin until that point at which Detective Doward received an indication from Kirnon that he had knowledge of the crime which he wished to relate. Until that time, Kirnon was, at best, a tenuous lead, a place to begin an investigation when no other more likely avenues were presented.[7] Before Kirnon said he would tell how it happened, the detectives had no reason to detain him. He was cooperating with them but had provided no useful information except to describe a minor fight at the Times Square Bar. I find as a fact that no custodial interrogation took place until after James Kirnon had been advised of his rights. At that point, the investigation had focused on Kirnon, he was no longer free to leave and he was entitled to the protections of Miranda v. Arizona.

█ Because Kirnon did give a statement to Detective Doward after he had been advised of his rights, I must determine if the defendant validly waived those rights. It has long been clear that an "accused may . . . intelligently and knowingly waive his privilege against self-incrimination and his right to counsel." Escobedo v. Illinois, 378 U.S. 478, 490, n. 14 (1964). The Miranda Court noted the possibility of waiver of the rights they

---

[7] It should be noted that the period of questioning prior to the time at which the defendant was advised of his rights and made his confession was substantially shorter than that which took place in Government v. Malone, 457 F.2d 548 (3d Cir. 1972), where it was determined that the burden which the prosecution had to prove the voluntariness "was fairly discharged." 457 F.2d at 549.

had pronounced but stated that the government has a "heavy burden" to demonstrate that the waiver was knowingly and intelligently made. 384 U.S. at 475. A valid waiver will not be presumed simply from silence of the accused after warnings are given. Furthermore, "lengthy interrogation or incommunicado incarceration before a statement is made is strong evidence that the accused did not validly waive his rights." 384 U.S. at 476. I will now examine the evidence in this case to ascertain whether a valid waiver was made.

First, I note and find that Detective Doward fully explained the Miranda rights to Kirnon prior to custodial interrogation. (Tr. p. 158.) In addition to explaining the rights, he gave a copy of them to the defendant to read. This copy, signed by James Kirnon, was introduced as Government Exhibit 1. Similarly, Detective Doward explained that the rights could be waived if Kirnon wished to make a statement. Kirnon stated that he understood. (Tr. p. 159.) Again, he signed a written consent form which appears in the file as Government Exhibit 2. After these explanations and signatures, Detective Doward asked Kirnon once again if he was "willing to make a statement of his own free will." (Tr. p. 160.) Mr. Kirnon replied, "yes". (Tr. p. 160.) On the basis of this testimony I find that the defendant James Kirnon knowingly and intelligently[8] waived his Miranda rights and made a completely voluntary statement.

---

[8] In connection with the requirement of an intelligent waiver, a related argument about the defendant's sophistication should be mentioned. Counsel argues that Kirnon is not bright and may not have fully realized what he was doing. Although there is no evidence that the defendant is of less than normal intelligence, even if this were so, he could still validly waive his Miranda rights so long as he had the capacity to understand the meaning and effect of the confession. People v. Tipton, 309 P.2d 813 (Cal. 1957) cert. denied 355 U.S. 846 (1957). I find on the basis of his in-court testimony alone that he is sufficiently intelligent to comprehend the meaning and effect of his confession.

Finally, I should emphasize that "intelligent" in this context refers "not to whether the defendant made an intelligent decision in the sense

The confession introduced as Government Exhibit 3 will therefore be admissible at trial and will not be suppressed on the ground that Miranda rights were violated. On reaching this determination I have considered only the question of voluntariness and compliance with Miranda. The contents of the confession and its truthfulness are totally irrelevant to my determination and I neither express nor have any views on them.

### IV. COMPLIANCE WITH RULE 5(a) AND THE McNABB–MALLORY RULE

Defendant's final argument in support of his motion to suppress is based on an alleged violation of the McNabb-Mallory Rule and Rule 5(a) of the Federal Rules of Criminal Procedure. James Kirnon was advised of his rights at about 2:35 P.M. by police detectives but was not taken before Judge Moorhead until 8 P.M. on the same day. Defendant argues that this time lapse constitutes "unnecessary delay" within the meaning of Rule 5(a) and that since a statement was obtained from him during this period it is inadmissible under Mallory v. United States, 354 U.S. 449 (1957). For several reasons I must reject this argument and conclude that no violation of defendant's presentment rights took place which would require his confession to be suppressed.

First, it is clear that the relevant time span is not from 2:35 until 8 P.M. but rather from 4 P.M., when Kirnon was arrested (Tr. p. 165), until 8 o'clock. Rule 5(a) is quite explicit that in determining whether there was "unnecessary delay," the Court should refer to the time when the defendant was arrested, not when interrogation began.

that it was wise or smart to admit his participation in the crime, but whether his decision was made with the full understanding that he need say nothing at all and that he might then consult with a lawyer if he so desired." United States v. Hall, 396 F.2d 841, 846 (4th Cir. 1968) cert. denied 393 U.S. 918 (1968).

Therefore, the delay in presentment in this case was merely 4 hours.

■ Second, insofar as the written confession is concerned, it certainly was not obtained as a result of the delay in presentment because it was given almost an hour before the arrest. Even if an unnecessary delay took place after the confession was made, it does not render the prior statement inadmissible. United States v. Mitchell, 322 U.S. 65 (1944); Holt v. United States, 280 F.2d 273 (8th Cir. 1960), cert. denied 365 U.S. 838 (1961). To reach a contrary conclusion would be to ignore the reason for the rule.

■ Third, because certain oral statements were apparently made by the defendant at the scene of the crime prior to presentment, it is necessary for me to determine if the delay was unreasonable and renders the oral statements inadmissible. The Mallory Court itself recognized that the presentment rule does not call for "mechanical or automatic obedience" and indicated that "circumstances may justify a brief delay." 354 U.S. at 455. However, the Court stated that "the delay must not be of a nature to give opportunity for the extraction of a confession." Id. Because the duration of the delay alone does not indicate whether it was of a nature to give opportunity to extract a confession,[9] the purpose for the delay assumes controlling significance. Here the purpose was to permit Kirnon to take the detectives to the scene of the crime, a trip which he was willing and anxious to make. (Tr. pp. 164, 204.) Whether such a delay for the purpose of further investigation is permissible has caused courts great difficulty. See, United States v. Vita, 294 F.2d 524 (2d Cir. 1961), cert. denied 369 U.S. 823 (1962); Naples v.

---

[9] Most courts have recognized that the number of hours is not determinative. Greenwell v. United States, 336 F.2d 962, 966 (D.C. Cir. 1964). It should be noted, though, that 18 U.S.C. § 3501(c) would sanction a six-hour delay.

United States, 307 F.2d 618 (D.C. Cir. 1962). I conclude that because the delay was brief and the defendant was willing to make the trip to the scene, there was no unreasonable delay which would render the oral statements inadmissible. See, United States v. Carney, 328 F.Supp. 948 (D.C. Del. 1971); Heidman v. United States, 259 F.2d 943 (D.C. Cir. 1958).

█ Finally, even if the delay were determined to be unreasonable, I believe that the defendant's effective Miranda waiver implied a waiver of his right to presentment without unreasonable delay. This result seems to be necessary in order to avoid the absurdity of permitting voluntary questioning after a Miranda waiver but concluding that the confession obtained was inadmissible because the defendant was questioned rather than taken to a magistrate as quickly as possible. The protections provided by Miranda render the appearance before a magistrate less important because the primary function of such an appearance-advisement of rights has already been accomplished. Therefore, it would seem that the interplay of Miranda and Mallory compels the conclusion that a valid waiver of rights under the former implies a waiver of rights under the latter. Pettyjohn v. United States, 419 F.2d 651, 656 (D.C. Cir. 1969); United States v. Howell, 470 F.2d 1064 (9th Cir. 1972); United States v. Woods, 468 F.2d 1024 (9th Cir. 1972). Therefore, because James Kirnon waived his Miranda rights and chose to make a voluntary statement, I conclude that he waived his right to presentment during the brief period that he accompanied the police detectives to the scene of the crime.

### ORDER

For the reasons stated, it is hereby ORDERED that defendant's motion to suppress all evidence and statements obtained from him be DENIED.